UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

QUANTA SPECIALTY LINES
INSURANCE COMPANY,

        Plaintiff,

- against -

INVESTORS CAPITAL CORPORATION,

        Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4 30 08

**OPINION AND ORDER**

06 Civ. 4624 (PKL)

## Appearances

TRAUB LIEBERMAN STRAUS & SHREWSBERRY LLP
Lisa L. Shrewsberry, Esq.
Richard J. Rogers, Esq.
Mid-Westchester Executive Park
Seven Skyline Drive
Hawthorne, NY 10532

Attorneys for Plaintiff

HITCHCOCK & CUMMINGS, LLP
Terence P. Cummings, Esq.
Carolyn Comparato, Esq.
757 Third Avenue, 25th Floor
New York, NY 10017

Attorneys for Defendant

**LEISURE, District Judge:**

Plaintiff Quanta Specialty Lines Insurance Company ("Quanta") brings this action seeking declaratory judgment that its insured, defendant Investors Capital Corporation ("ICC"), is not entitled to coverage for defense and indemnity with respect to arbitrations brought against ICC. Along with its answer, ICC asserts several counterclaims against Quanta, which seek rescission of Quanta's insurance policies or, alternatively, judgment that ICC is entitled to coverage under those policies. Three motions related to ICC's pleading are now before the Court.[1]  First, Quanta moves to dismiss or strike ICC's counterclaims pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(f), and to strike certain of ICC's affirmative defenses under Rule 12(f).  Second, ICC seeks pre-answer security from Quanta under New York Insurance Law § 1213(c). Third, ICC seeks leave to amend its answer to add an affirmative defense pursuant to Rule 15(a).  For the reasons set forth below, Quanta's motion is GRANTED IN PART and DENIED IN PART and ICC's motions are DENIED.

## Background

ICC, a Delaware corporation with its principal place of business in Massachusetts, "is a nationally recognized

---

[1] Discovery proceeded in this action despite the pending motions.  At the close of discovery, each party moved for summary judgment; these motions will not be addressed by the Court in this Opinion and Order.

securities broker/dealer licensed by the NASD [which] does business through licensed registered representatives." (Counterclaims ¶ 5.) Through William Gallagher Associates Insurance Broker of Boston, Massachusetts ("Gallagher"), ICC procured from Quanta, an Indiana corporation with its principal place of business in New York, (Counterclaims ¶ 9; Compl. ¶ 1), a "Broker/Dealer and Registered Representatives Professional Liability Policy", which provided coverage to ICC from December 31, 2004 to December 31, 2005 (the "Original Policy"). (Compl. ¶ 5, Ex. A; Counterclaims ¶ 7.) Thereafter, the policy was renewed for the period of December 31, 2005 to December 31, 2006 (the "Renewal Policy"). (Counterclaims Ex. 2.) Section 1 of the Original Policy and the Renewal Policy (collectively, the "Policies") states, in relevant part, that:

> [Quanta] shall pay, on behalf of [ICC], Damages which [ICC] becomes legally obligated to pay because of a Claim that is both made against [ICC] and reported to [Quanta] in writing during the Policy Period or Discovery Period, if applicable, for a Wrongful Act committed solely in the rendering or failing to render Professional Services for a Client . . . .

(Compl. Ex. A; Counterclaims Ex. 2.) The Policies define "Claim" as "a demand received by [ICC] for Damages (including pleadings received in a civil litigation or arbitration) for an actual or alleged Wrongful Act." (Compl. Ex. A; Counterclaims Ex. 2.) A "Wrongful Act" is "a negligent act or omission . . .

2

committed by [ICC] in the rendering of Professional Services."
(Compl. Ex. A; Counterclaims Ex. 2.) Further, "Interrelated
Wrongful Acts" are any Wrongful Acts that are "similar,
repeated, or continuous" or "connected by reason of any common
fact, circumstance, situation, transaction, casualty, event,
decision or policy or one or more series of facts,
circumstances, situations, transactions, casualties, events,
decisions or policies." (Compl. Ex. A; Counterclaims Ex. 2.)
Section 6 of the Policies, entitled "Single Claim/Interrelated
Wrongful Acts," states that:

> All Claims based upon or arising out the
> [sic] same Wrongful Act or Interrelated
> Wrongful Acts shall be considered a single
> Claim and each such single Claim shall be
> deemed to have been made on the earlier of
> the following:
>
> A.    when the earliest Claim arising out of
>       such Wrongful Act or Interrelated
>       Wrongful Acts was first made; or
>
> B.    when notice was provided to [Quanta]
>       pursuant to Section 12 herein
>       concerning a Wrongful Act giving rise
>       to such Claim.

(Compl. Ex. A; Counterclaims Ex. 2.)

On August 12, 2005, ICC was served with a Statement of
Claim in a National Association of Securities Dealers, Inc.
("NASD") arbitration commenced by Lillie H. Green and other
unsophisticated retirees (the "Green Arbitration"), all of whom
claim to have lost most of their life savings as a result of the
actions of Joseph Lionel Jones ("Jones"), a licensed registered

3

representative associated with ICC. (Compl. Ex. B at 1-2; Compl. ¶ 8; Counterclaims ¶ 15.) Specifically, the Statement of Claim alleges that, in 2002, Jones was operating a Ponzi Scheme, whereby he was "engaged in the practice of 'selling away' investment contracts issued by BAB Productions which were not registered securities." (Compl. Ex. B at 2.) The claimants, who were induced by Jones to invest in BAB Productions, assert, *inter alia*, that ICC failed to supervise Jones. (Id. Ex. B at 9-10.) Consequently, claimants lost the funds they had invested and seek "compensatory damages of up to $1,000,000, including lost profits if their monies had been prudently invested, pre-judgment interest, post-judgment interest, attorneys' fees, punitive damages, a return of all fees, management charges and commissions, plus interest, and the costs of the action." (Id. ¶ 9, Ex. B. at 10.) On August 15, 2005, ICC provided notice to Quanta of the Green Arbitration and requested from Quanta defense and indemnity coverage related thereto. (Id. ¶¶ 8, 12.) In response, Quanta agreed to pay for ICC's requested defense counsel, but purported to reserve its rights to deny coverage for the Green Arbitration. (Id. ¶¶ 12-13; Counterclaims ¶ 26; Compl. Ex. C.)

In April 2006, ICC was served with a substantially similar Statement of Claim in another NASD arbitration (the "Mitchell

4

Arbitration").² (Compl. ¶ 16, Ex. E; Counterclaims ¶ 18.)  Once again, claimants allege that ICC failed to supervise Jones, who "sold fraudulent investments in an enterprise known as BAB Productions to hundreds of mostly-minority investors . . . ." (Compl. Ex. E.)  On April 16, 2006, ICC provided notice to Quanta of the Mitchell Arbitration and again requested defense and indemnity coverage. (Compl. ¶¶ 16, 19.)

Quanta ultimately disclaimed coverage for both the Green and Mitchell Arbitrations, (id. ¶ 25; Counterclaims ¶ 27), maintaining that it need not provide coverage to ICC because ICC was aware of an investigation conducted and a claim made concerning Jones's alleged Ponzi Scheme prior to the December 31, 2004 inception date of the Original Policy.  On June 9, 2004, a securities investigator from the State of North Carolina, Department of the Secretary of State, Securities Division had contacted ICC and requested documentation related to an ongoing investigation of Jones. (Compl. ¶ 20, Ex. F.)  ICC provided the necessary information to the investigator, (Id. ¶ 21, Ex. G), and soon thereafter, a cease-and-desist order was issued against Jones. (Id. ¶ 22, Ex. H.)  Relying upon this order, one of Jones's clients, Patricia Alston, contacted ICC through her attorney on October 21, 2004, requesting

---

² Other similar underlying actions have come to light since the initial pleadings in this case.  A specific discussion of each of these actions is unnecessary at this juncture.

reimbursement from ICC for her investments in BAB Productions.
(Id. Ex. I.) Because ICC had advanced knowledge of an
investigation and claim relating to Jones's conduct, Quanta now
seeks declaratory judgment that, under the terms of the
Policies, coverage should not be afforded to ICC for the Green
and Mitchell Arbitrations.

In its first three counterclaims, ICC contends that the
Policies should be rescinded for violating New York statutes and
regulations governing insurance policies. Alternatively, ICC
maintains that it did not anticipate and had no advanced
knowledge of any Claims, Wrongful Acts, or Interrelated Wrongful
Acts as defined by the Policies. Accordingly, ICC asserts three
additional counterclaims against Quanta -- for declaratory
judgment, specific performance, and breach of contract --
seeking coverage under the policies for defense and indemnity in
the Green and Mitchell Arbitrations. Quanta moves to dismiss
each of ICC's counterclaims. ICC not only opposes Quanta's
motion, but also moves to compel Quanta to provide pre-answer
security and to amend its pleading to add an affirmative
defense.

## Discussion

I. Quanta's Motion to Dismiss and/or Strike ICC's Counterclaims and to Strike Certain Affirmative Defenses

### A. **Rule 12(b)(6) Standard**

When determining whether to dismiss a claim on a motion for failure to state a claim upon which relief may be granted, the Court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001) (quoting Tarshis v. Riese Org., 211 F.3d 30, 35 (2d Cir. 2000)); see also Hosp. Bldg. Co. v. Trs. of Rex Hosp., 425 U.S. 738, 740 (1976); Walker v. City of New York, 974 F.2d 293, 298 (2d Cir. 1992). Similarly, when considering a motion to dismiss a counterclaim for failure to state a claim, the Court must accept the material facts alleged in defendant's answer and counterclaim as true and construe all reasonable inferences in favor of defendant. See Twinlab Corp. v. Signature Media Servs., No. 99 Civ. 169, 1999 U.S. Dist. LEXIS 18973, at *10 (S.D.N.Y. Dec. 7, 1999). Thus, "[t]he issue is not whether [the claimant] will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); see also Hamilton Chapter

7

of Alpha Delta Phi, Inc. v. Hamilton Coll., 128 F.3d 59, 62-63

(2d Cir. 1997). A party's claim should not be dismissed in this

instance "unless it appears beyond doubt that the [movant] can

prove no set of facts in support of his claim which would

entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46

(1957); see also Lipsky v. Commonwealth United Corp., 551 F.2d

887, 894-95 (2d Cir. 1976). Nevertheless, the claim "must

contain allegations concerning each of the material elements

necessary to sustain recovery under a viable legal theory."

Huntington Dental & Med. Co. v. Minnesota Mining & Mfg. Co., No.

95 Civ. 10959, 1998 U.S. Dist. LEXIS 1526, at *9 (S.D.N.Y. Feb.

13, 1998). Lastly, although the Court must accept as true the

factual allegations set out in a complaint or counterclaim, a

complaint or counterclaim "which consists of conclusory

allegations unsupported by factual assertions fails even the

liberal standard of Rule 12(b)(6)." DeJesus v. Sears, Roebuck &

Co., Inc., 87 F.3d 65, 70 (2d Cir. 1996) (internal quotation

marks omitted).

### B. **Rule 12(f) Standard**

Rule 12(f) of the Federal Rules of Civil Procedure provides

that "the court may order stricken from any pleading . . . any

redundant, immaterial, impertinent, or scandalous matter." See

Emmpresa Cubana Del Tabaco v. Culbro Corp., 213 F.R.D. 151, 155

(S.D.N.Y. 2003). "'The courts should not tamper with pleadings

unless there is a strong reason for so doing.'" Pena v. Guzman,
No. 03 Civ. 5130, 2004 U.S. Dist. LEXIS 1844, at *10 (S.D.N.Y.
Feb. 11, 2004) (quoting Lipsky, 551 F.2d at 893). As such,
motions to strike are "generally disfavored." Emmpresa Cubana
Del Tabaco, 213 F.R.D. at 155 (internal quotation marks and
citations omitted). Moreover, "'unless it is clear that the
allegations in question can have no possible bearing on the
subject matter of the litigation,'" motions to strike
allegations in the pleadings should be denied. Id. (quoting
Ulla-Maija, Inc. v. Ulla-Maija Kivimaki, No. 02 Civ. 3640, 2003
U.S. Dist. LEXIS 977, at *13 (S.D.N.Y. Jan. 23, 2003)).

C. **ICC's Counterclaims Seeking Rescission of the Policies**

The first set of ICC's counterclaims seek rescission
because the Policies are unlawful group insurance policies,[3] do
not comply with various New York excess line requirements, and
are *malum in se* due to Quanta's doing insurance business in New
York without a license, in violation of New York Insurance Law
§ 1102. Quanta's principal argument in moving to dismiss these
claims is that, in the absence of express language to the

---

[3] In the absence of statutory permission, liability policies issued on a group
basis are unlawful. See N.Y. Ins. Dep't Circular Ltr. Rul. No. 14 (July 24,
1981) (ICC Memo. of Law Appx. A) ("All excess line brokers are advised that
the Insurance Law does not provide for property and casualty insurance to be
written on a group basis in New York."); see also N.Y. Ins. Dep't Circular
Ltr. No. 6 (Apr. 19, 2005) (ICC Ans. Ex. 6) ("A policy that insures an
insurance company, and its insurance agents and/or the representatives of the
insurer's affiliate, a securities broker/dealer, may not be issued as a group
personal excess insurance policy under N.Y. Ins. Law § 3445 (McKinney
2000).").

9

contrary, violations of New York Insurance Law do not afford an insured with a private right of action. ICC maintains that because the agreement was made in contravention of New York Insurance Law, it may avoid enforcement of the contract as a member of the class -- i.e., the insured -- that the statute was meant to protect.

ICC contends that it may proceed against Quanta and seek rescission, stating that "for centuries it has been the case that an innocent party to an unlawful contract may seek rescission."[4] (Def.'s Memo. of Law at 5.) In support of this general proposition, ICC relies heavily upon Dornberger v. Metropolitan Life Insurance, 961 F. Supp. 506, 532-33 (S.D.N.Y. 1997). There, plaintiff claimed it was entitled to rescission because the insurer had violated various European insurance laws. Id. at 535-36. The Court determined that rescission was an appropriate remedy because "[d]efendants allegedly violated laws designed to regulate the merits and subject matter of insurance transactions." Id. at 535. In so doing, it contrasted a seminal New York case, John E. Rosasco Creameries, Inc. v. Cohen, 276 N.Y. 274, 11 N.E.2d 908 (1937), which held that:

---

[4] Construing all reasonable inferences in favor of ICC, the Court accepts ICC's characterization of itself as an innocent party. ICC claims that it has yet to receive any benefit from the Policies (Def's Memo. of Law at 11 n.10), while Quanta counters that it has paid significant funds under the Policies on claims unrelated to the Green and Mitchell Arbitrations. (Pl.'s Memo. of Law at 3 n.3.)

10

> Where contracts which violate statutory
> provisions are merely *malum prohibitum*, the
> general rule [that illegal contracts are
> unenforceable] does not always apply.   If
> the statute does not provide expressly that
> its violation will deprive the parties of
> their right to sue on the contract, and the
> denial of relief is wholly out of proportion
> to the requirements of public policy or
> appropriate individual punishment, the right
> to [enforce the contract] will not be
> denied.

Dornberger, 961 F. Supp. at 534 (quoting Rosasco, 276 N.Y. at

278, 11 N.E.2d at 909) (alterations in original).   Applying this

principle, the New York Court of Appeals held that rescinding an

unlicensed milk dealer's contract was wholly out of proportion

to public policy and legislative intent. Rosasco, 276 N.Y. at

280, 11 N.E.2d at 910 ("We have here a statute which provides

that milk dealers shall not sell milk unless duly licensed.   The

statute imposes penalties for its violation by way of fine and

imprisonment, but it does not expressly provide that contracts

made by milk dealers shall be unenforcible.   Nothing in this

statute reveals an implied intent to deprive unlicensed dealers

of the right to recover the reasonable value of the milk sold by

them, and . . . . such additional punishment should not be

imposed unless the legislative intent is expressed or appears by

clear implication."); see Atkin v. Hill, Darlington, & Grimm, 15

A.D.2d 362, 224 N.Y.S.2d 553 (1st Dep't 1962) ("In none of

[Rosasco and its progeny] would compliance with the applicable

statute have halted the transaction; noncompliance had not in

11

any manner entered into, affected or tainted it.") (internal quotations omitted). Thus, this Court must determine, based upon legislative intent and public policy considerations, whether Quanta's alleged Insurance Law violations relate to the merits of its transaction with ICC.

Beginning with ICC's second counterclaim, which seeks rescission because the Policies violate New York's excess line requirements, see N.Y. Ins. Law §§ 2105, 2118, 2130, ICC maintains that such requirements are intended to govern the substance of insurance transactions. According to the New York legislature:

> [A] principal goal of effective insurance regulation must be to allow citizens of this state reasonable access to financially sound and reliable insurers for their insurance coverage needs. . . . The legislature hereby declares that certain . . . insurers should be allowed to provide coverage to citizens of this state, either as licensed insurers or as eligible excess line insurers, provided certain conditions and safeguards are met.

Assembly Bill No. 4139-A, 1993 N.Y. ALS 663, § 1 (1993).

Moreover, while recognizing that regulation of the excess line market was necessary, the legislature emphasized the importance of providing access to unauthorized, excess line insurers. To that end, the excess line requirements serve as a procedural mechanism whereby unauthorized insurers are able to enter the New York insurance market upon complying with certain

12

conditions. This process is monitored by the Superintendent of the Insurance Department (the "Superintendent"), who is given "broad regulatory powers over excess line brokers." Polly Esther's South, Inc. v. Setnor Byer Bogdanoff, Inc., 10 Misc.3d 375, 387, 807 N.Y.S.2d 799, 811 (N.Y. Sup. Ct. 2005). Indeed, the sections relied upon by ICC empower the Superintendent to regulate the excess line brokers: § 2105 relates to the Superintendent's issuing, suspending, and revoking excess line brokers' licenses; § 2118 imposes a duty on licensed excess line brokers to use due care, compliance of which is monitored by the Superintendent; and § 2130 creates an excess line association of New York, to be supervised by the Superintendent.[5] These rules do not affect the substance of the underlying insurance contract between an unauthorized insurer and its insured. For example, if the Superintendent had compelled Quanta to comply with the Insurance Law, the transaction between Quanta and ICC would not have been halted. Thus, to allow ICC a private cause of action

---

[5] Though these requirements appear to apply to excess line brokers, ICC argues that "[i]t is not persuasive for Quanta to argue that the insurance broker was responsible for ensuring that the policies carried the notice and otherwise complied with the requirements of New York excess line requirements." (Def.'s Memo. of Law at 8 n.6.) ICC instead attempts to create out of whole cloth "a duty to disclose to [ICC] and to Gallagher that the Policies were considered by Quanta to be New York transactions subject to compliance with New York's regulatory requirements." (Counterclaims ¶ 56.) With no support for this assertion, the Court is disinclined to hold Quanta liable under the excess line requirements. See 3405 Putnam Realty Corp. v. Chubb Custom Ins. Co., 14 A.D.3d 311, 788 N.Y.S.2d 66 (1st Dep't 2005) (finding that an insurer should not be penalized under § 2105 despite evidence submitted by the insured that neither the insurer nor the broker were licensed to do insurance business in New York).

13

would be incompatible with the clearly defined procedural

mechanism provided by the legislature. See Certain Underwriters

at Lloyd's, London v. Plasmanet Inc., No. 01 Civ. 6023, 2002

U.S. Dist. LEXIS 14190, at *9-10 (S.D.N.Y. Aug. 1, 2002)

("'Typically, courts do not construe the Insurance Law as

providing for a private right of action, in the absence of

express language authorizing such enforcement.' 'A private

right of action should not be judicially sanctioned where it is

incompatible with the enforcement mechanism chosen by the

legislature or discordant with some other aspect of the overall

statutory scheme.'") (internal citation omitted) (quoting Bauer

v. Mellon Mortgage Co., 178 Misc.2d 234, 237, 680 N.Y.S.2d 397,

400 (N.Y. Sup. Ct. 1998)); 3405 Putnam Realty Corp., 14 A.D.3d

at 311-12, 788 N.Y.S.2d at 66-67 (choosing not to invalidate an

insurance policy due to an insurer's failure to comply with

excess line requirements); Polly Esther's South, Inc., 10

Misc.3d at 387, 807 N.Y.S.2d at 811 ("[I]mplying a private right

of action for violation of the relevant provisions of the

Insurance Law and regulations would interfere with the

legislative scheme that already provides for review and penalty

by the Superintendent of the Insurance Department . . . ."); 

City of New York v. Britestarr Homes, Inc., 150 Misc.2d 820,

826, 570 N.Y.S.2d 882, 887 (N.Y. Sup. Ct. 1991) (finding that

"there is nothing which invalidates a policy issued by an

14

insurer in violation of the Insurance Law").[6]  Therefore, ICC's

second counterclaim is dismissed.

With these principles in mind, ICC's first counterclaim,

seeking rescission because the Policies are unlawful group

insurance policies, must also be dismissed.  Assuming, *arguendo*,

that the Policies constitute unlawful group policies, the

Superintendent is tasked with redressing such a problem.  ICC

provides the Court with no reason to infer a private cause of

action, but rather offers up documents that confirm the

Superintendent's broad supervisory powers under the Insurance

Law. See N.Y. Ins. Dep't Circular Ltr. No. 6 (Apr. 19, 2005)

("If any policy is found to have been issued in violation, the

insurer must restructure the program and make appropriate

filings to be in compliance with the laws and regulations.  Any

illegal policy must be nonrenewed as of its next renewal

date."); N.Y. Ins. Dep't Office of General Counsel, Informal

Opinion (Jan. 21, 2004) (stating that a company agreed to revise

---

[6] ICC summarily rejects the significance of some of these cases.  For example,
in 3405 Putnam Realty Corp., ICC argues that "the underlying insurance
contract was otherwise a lawful contract[, while i]n this case, not only are
the policies illegal group policies, they suffer from other defects, such as
the 'claims made and reported' provision." (Def.'s Memo. of Law at 7.)  With
respect to Plasmanet, ICC states that unlike the instant action, the insured
in that case "received at least one notice that the policy was a New York
excess line placement, and being a New York resident, had obtained policies
from unlicensed insurers in compliance with the New York excess line
requirements on previous occasions." (Id. at 11 n.11.)  ICC's attempts to
distinguish these cases are unpersuasive.  Essentially, ICC argues that the
cases are inapplicable because the insurers there were less culpable than
Quanta under New York Insurance Law.  This assertion ignores, however, the
predicate question of whether ICC can maintain a private cause of action
against Quanta premised upon violations of the Insurance Law.

its policy in accordance with advice received from the
Superintendent that it had issued an illegal group insurance
policy). Voiding the contract at issue here would not be
commensurate with Quanta's alleged Insurance Law violation,
which, if true, is most suitably remedied by the Superintendent.
Thus, ICC's second counterclaim is dismissed.

Finally, ICC's third counterclaim alleges that Quanta was
an unauthorized insurer doing business in New York, in violation
of Insurance Law § 1102. The court's analysis in 3405 Putnam
Realty Corp. disposes of this claim:

> Insurance Law § 1102(a) specifically sets
> forth the penalties to be imposed with
> respect to each violation of the licensing
> requirements of the Insurance Law, and those
> penalties consist of a fine of $1,000 for
> the first violation and $2,500 for each
> subsequent violation. Although section
> 1102(a) further provides that these
> penalties shall be imposed "in addition to
> any other penalty provided by law," it can
> hardly be assumed that the Legislature's
> mention of "any other penalty provided by
> law" was a reference to a judicially created
> penalty . . . .

14 A.D.3d at 311-12, 788 N.Y.S.2d at 66 (internal quotations and
citations omitted). Accordingly, ICC's third counterclaim is
also dismissed.

16

## D. **ICC's Counterclaims Seeking Coverage Under the Policies**

Quanta moves to dismiss or strike ICC's fourth, fifth, and sixth counterclaims because they are redundant, raising "the same exact issues" as the complaint. (Pl.'s Memo. of Law at 9.) Quanta's complaint seeks a declaration that ICC is not entitled to coverage for the Green and Mitchell Arbitrations. ICC's counterclaims, however, seek affirmative relief, namely that ICC is entitled to coverage under the Policies.[7] In declaratory judgment actions brought by insurers, courts in this district routinely allow an insured to assert counterclaims for declaratory judgment or breach of contract. See, e.g., Guideone Speciality Mut. Ins. Co. v. Congregation Bais Yisroel, 381 F. Supp. 2d 267, 282 (S.D.N.Y. 2005) (allowing an insured's breach of contract claim to proceed to trial where the claim was "simply the converse of [insurer's] claim seeking a declaration of non-coverage"); Liberty Surplus Ins. Corp. v. Segal Co., No.

---

[7] To the extent that ICC's counterclaim for declaratory judgment may prove to be identical to its counterclaims for specific performance or breach of contract, the Court nevertheless will not dismiss it. In Zurich American Insurance Co. v. Paxson Communications Corp., under similar circumstances, the Court held:

> While the facts underlying both the [breach of contract] and [declaratory judgment] counterclaims may be identical and while both claims may ultimately prove to be coextensive, it is undisputed that the declaratory judgment counterclaim properly states a claim under Fed. R. Civ. P. 12(b)(6). It is well established that declaratory relief is alternative or cumulative and not exclusive or extraordinary.

No. 03 Civ. 1503, 2004 U.S. Dist. LEXIS 9093, at *5-6 (S.D.N.Y. May 19, 2004) (internal quotations removed).

03 Civ. 2194, 2004 U.S. Dist. LEXIS 18886, at *2, 5 (S.D.N.Y. Sept. 21, 2004) (Jones, J.). Moreover, Quanta fails to support its assertion that ICC's counterclaims will result in confusion, delay, or wasted resources. To the contrary, the Court will be able to construe the relevant policy provisions and, whether at the summary judgment stage or at trial, grant complete relief to either Quanta or ICC. Accordingly, Quanta's motion to dismiss or strike ICC's fourth, fifth, and sixth counterclaims is denied.

### E. **ICC's Affirmative Defenses**

Finally, Quanta moves to strike several of ICC's affirmative defenses. ICC's first affirmative defense -- failure to properly state a claim upon which relief can be granted as a matter of law -- is appropriate and will not be struck. See Sec. Exch. Comm'n v. Toomey, 866 F. Supp. 719, 723 (S.D.N.Y. 1992) ("[I]t is well settled that the failure-to state-a-claim defense is a perfectly appropriate affirmative defense to include in the answer."). ICC's fourth and fifth affirmative defenses are struck because, as described above, they are improperly premised upon claims that the Policies were issued in contravention of New York Insurance Law. See supra at 9-16. ICC's seventh affirmative defense states that "Section 6 of the policy does not preclude coverage . . . ." (Ans. ¶ 64.) Quanta believes that this is merely a restatement of ICC's

18

answer, thereby causing confusion. At this point, the Court does not find a compelling reason, as required under Rule 12(f), to strike this affirmative defense. See Walsh v. Cook, No. 96 Civ. 9356, 1997 U.S. Dist. LEXIS 8178, at *1-2 (S.D.N.Y. June 12, 1997) ("[T]he inclusion of affirmative defenses in an answer is a statement of position by a defendant in the same way that a complaint is a statement of position by a plaintiff. The existence of these pleadings does not require any court to make a determination of the merits of the parties' respective claims at this stage of the proceeding."). Therefore, ICC's fourth and fifth affirmative defenses are struck, however, its first and seventh affirmative defenses remain.

## II. ICC's Motion to Compel Pre-Answer Security

ICC moves to compel Quanta to post pre-answer security. In New York, unauthorized foreign insurers generally are required to post security before filing responsive pleadings in proceedings brought against it. See N.Y. Ins. Law § 1213(c)(1); see also Gravatt v. Gen. Star Indem. Co., No. 98 Civ. 6670, 1998 U.S. Dist. LEXIS 18827, at *9 (S.D.N.Y. Dec. 2, 1998); Skandia An. Reinsurance Corp. v. Caja Nacional de Ahorro y Segoro, No. 96 Civ. 2301, 1997 U.S. Dist. LEXIS 7221, at *6-7 (S.D.N.Y. May 23, 1997). Under § 1213(e), however, "the bond requirement of 1213(c)(1) does not apply to unauthorized insurers who issue certain policies pursuant to § 2105 or § 2117 (b) or (c) of New

York Insurance Law." Gravatt, 1998 U.S. Dist. LEXIS 18827, at
*10. Quanta and ICC dedicate their respective briefs to the
issue of whether § 1213(e) applies to Quanta.

The Court need not consider these arguments because a
threshold issue is dispositive of ICC's motion. Specifically,
ICC, a non-resident, may not avail itself of the protections of
§ 1213.[8] The purpose of § 1213 is to:

> subject certain insurers to the jurisdiction
> of the courts of this state in suits by or
> on behalf of insureds or beneficiaries under
> certain insurance contracts. The
> legislature declares that it is a subject of
> concern that many *residents of this state*
> hold policies of insurance issued or
> delivered in this state by insurers while
> not authorized to do business in this state,
> thus presenting to *such residents* the often
> insuperable obstacle of resorting to distant
> forums for the purpose of asserting legal
> rights under such policies.

N.Y. Ins. Law. § 1213(a) (emphasis added). It thus serves as a
long-arm statute, "subject[ing] unauthorized foreign and alien
insurers who have transacted business in the state to the
jurisdiction of the New York courts." Morgan v. Am. Risk Mgmt.,
Inc., No. 89 Civ. 2999, 1990 U.S. Dist. LEXIS 9037, at *17
(S.D.N.Y. July 20, 1990). A provision such as
§ 1213(c)(1) helps to ensure that a New York resident will be
able to proceed against an out-of-state insurer in New York. See

---

[8] Quanta notes, without elaborating, that "[i]t is questionable whether a non-New York resident . . . can resort to New York Insurance Law Section 1213."
(Pl.'s Memo. of Law at 3.)

British Int'l Ins. Co. Ltd. v. Seguros La Republica, 212 F.3d 138, 140 (2d Cir. 2000).

In seeking pre-answer security from Quanta, ICC ignores the underlying premise of § 1213, namely that the statute is intended to allow New York residents to assert their legal rights in New York courts. See Signal Mut. Indem. Ass'n, Ltd. v. Rice Mohawk U.S. Constr., Co., Ltd., No. 95 Civ. 3721, 1997 U.S. Dist. LEXIS 3615, at *6-7 (S.D.N.Y. Mar. 28, 1997) ("[T]he New York legislature created Insurance Law § 1213(c) for the protection of its residents. Insurance Law § 1213(c) ensures that New York residents can readily access a foreign insurer's funds to satisfy judgments against that insurer.") (internal citations omitted); Allstate Ins. Co. v. Administratia Asigurarilor de Stat, 875 F. Supp. 1022, 1025 (S.D.N.Y. 1995) ("[S]ection 1213 was enacted to aid New York residents who are insured by foreign insurance companies that are not authorized to do business in New York."). While Quanta is an unauthorized insurance company, ICC is a Delaware corporation with its principal place of business in Massachusetts. (Counterclaims ¶ 4; Def.'s Memo. of Law at 7). Thus, ICC may not invoke § 1213 for its benefit. See Allstate Ins. Co., 875 F. Supp. at 1025-26 (deeming § 1213 inapplicable to plaintiff, which was an assignee and successor-in-interest to two foreign corporations) (citing Food Fair Stores v. Gen. Excess Ins. Co., Ltd., 21 A.D.2d 684,

684, 250 N.Y.S.2d 458, 459-60 (2d Dep't 1964)); Morgan, 1990 U.S. Dist. LEXIS 9037, at *21 (stating that § 1213 only may be invoked by residents of New York or corporations authorized to do business in New York) (citing Clifton Prods., Inc. v. Am. Universal Ins. Co., 169 F. Supp. 842, 845 (S.D.N.Y. 1959)). ICC's motion to compel pre-answer security from Quanta is therefore denied.

### III. ICC's Motion to Amend Its Answer

ICC also moves, under Federal Rule of Civil Procedure 15(a), for leave of Court to add an affirmative defense to its answer pursuant to New York Business Corporation Law § 1312. Under Rule 15(a), a court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The Second Circuit has followed the U.S. Supreme Court's direction that permission to amend a claim "should be freely granted." Oliver Schs., Inc. v. Foley, 930 F.2d 248, 252 (2d Cir. 1991) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)). Notwithstanding this liberal standard, a court may deny leave to amend where there has been undue delay or bad faith on the moving party's part, prejudice to the non-movant, or where leave would be futile. See Monahan v. New York City Dep't of Corr., 214 F.3d 275, 283 (2d Cir. 2000) (citing Foman, 371 U.S. at 182). Despite Quanta's arguments to the contrary, the Court perceives no dilatory conduct by ICC. Rather, ICC sought leave to amend less than one

22

month after serving its answer, and as such, Quanta's claim of prejudice is dubious. A more extensive analysis of the proposed affirmative defense is warranted, however, to determine whether granting ICC leave to amend would be a futile exercise.

New York Business Corporation Law § 1312 is designed to "regulate foreign corporations doing business within the state and to put them on equal footing with domestic corporations in court proceedings."[9] Posadas de Mexico, S.A. de C.V. v. Dukes, 757 F. Supp. 297, 300 (S.D.N.Y. 1991); see Storwal Int'l, Inc. v. Thom Rock Realty Co., L.P., 784 F. Supp. 1141, 1145 (S.D.N.Y. 1992) (Sweet, J.). The statute "was never intended to serve as a shield to protect defendants from legitimate claims by foreign companies." Dukes, 757 F. Supp. at 300. If a foreign corporation's New York-based activities are "'merely incidental

---

[9] Section 1312(a) states:

> A foreign corporation doing business in this state without authority shall not maintain any action or special proceeding in this state unless and until such corporation has been authorized to do business in this state and it has paid to the state all fees and taxes imposed under the tax law or any related statute, as defined in section eighteen hundred of such law, as well as penalties and interest charges related thereto, accrued against the corporation. This prohibition shall apply to any successor in interest of such foreign corporation.

N.Y. Bus. Corp. Law § 1312(a). The statute is applicable to actions brought in both state courts and federal courts sitting in diversity. See Netherlands Shipmortgage Corp., Ltd. v. Madias, 717 F.2d 731, 735 (2d Cir. 1983) ("Because jurisdiction rests on diversity, B.C.L. § 1312 precludes the maintaining of an action by an unauthorized foreign corporation not only in the state courts of New York but also in the federal courts located in that state.").

23

to its business in interstate and international commerce,'"
§ 1312 will not preclude it from bringing suit in New York, id.
at 301 (quoting Alicanto, S.A. v. Woolverton, 129 A.D.2d 601,
603, 514 N.Y.S.2d 96, 98 (2d Dep't 1987)); systematic activity
in New York is necessary in order to apply § 1312, id. at 300.
"No neat standard exists for § 1312. Instead, courts conduct
inherently fact-bound analyses, focusing on whether the foreign
corporation's activities are permanent, continuous, and
regular." Storwal Int'l, Inc., 784 F. Supp. at 1144. Further, a
foreign corporation is presumed to be doing business where it is
incorporated; the party invoking § 1312 has the burden to prove
that the foreign corporation is engaged in regular, systematic
activities in New York. Id. This burden is heavier than it
would be under a jurisdictional analysis "[b]ecause of the
possibility of an unconstitutional infringement of interstate
commerce . . . ." Id.; see Colonial Mortgage Co. v. First
Federal Sav. & Loan Ass'n of Rochester, 57 A.D.2d 1046, 1047,
395 N.Y.S.2d 798, 798 (4th Dep't 1977) ("The incidents of
business transacted in New York by a foreign corporation may be
sufficient to subject it to service of New York process (CPLR
302) and yet insufficient to require it to take out a
certificate authorizing it to do business in New York.").

Against the backdrop of this strict standard, granting ICC
leave to amend its answer would be futile. That Quanta

24

maintains its principal place of business in New York is not

enough to constitute systematic intrastate activity under

§ 1312. See Stafford-Higgins Indus., Inc. v. Gaytone Fabrics,

Inc., 300 F. Supp. 65, 67 (S.D.N.Y. 1969) (Weinfeld, J.)

(finding that the maintenance of a New York office, *inter alia*,

is not enough to preclude a foreign entity's actions under

§ 1312). ICC offers no further information to satisfy its

burden of showing that Quanta is engaged in systematic

intrastate activities.[10]  Indeed, ICC effectively concedes the

interstate nature of Quanta's business, stating that Quanta "has

issued insurance policies from that headquarters to residents of

multiple states, including [ICC], a resident of Massachusetts."

(Def.'s Reply Memo. of Law at 4; see also id. at 5.)

Additionally, Quanta, as an excess line insurer, does not

require New York licensing. See Dukes, 757 F. Supp. at 302

(considering that a foreign company did not need to obtain a

license in New York as one factor germane to whether a company's

intrastate activity was regular and continuous).

Section 1312 is meant to protect New York companies, which

must comply with onerous state regulations, from foreign

companies that attempt to shirk those requirements yet still

avail themselves of the benefits of conducting largely

---

[10] ICC apparently misconstrues § 1312 as an absolute prohibition against
foreign companies from bringing suit in New York. (Def.'s Reply Memo. of Law
at 5.)  The case law relied upon by Quanta, and cited by the Court above,
reveals otherwise.

intrastate business activities. Because Quanta is an interstate
company with incidental ties to New York, the purposes of § 1312
would not be furthered by precluding it from proceeding in this
action. See Colonial Mortgage Co., 57 A.D.2d at 1047, 395
N.Y.S.2d at 798 ("Section 1312 may not, under the protections
afforded by the commerce clause of the United States
Constitution, deny a foreign corporation access to New York
courts where the foreign corporation is engaged solely in
interstate commerce.") (internal citation omitted).
Accordingly, ICC's affirmative defense under § 1312 would be
futile and its motion for leave to amend its answer is denied.

## Conclusion

For the foregoing reasons, Quanta's motion to dismiss and/or strike ICC's counterclaims and certain affirmative defenses is GRANTED IN PART and DENIED IN PART. ICC's motions to compel pre-answer security from Quanta and for leave to amend its answer to add an affirmative defense are DENIED.

**SO ORDERED.**

**New York, New York**

April **30** , 2008

Peter K. Leisure

U.S.D.J.

27