UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



QUANTA LINES INSURANCE COMPANY,

        Plaintiff,

 - against -

INVESTORS CAPITAL CORPORATION,

        Defendant.

**OPINION AND ORDER**

06 Civ. 4624 (PKL)

## APPEARANCES

TRAUB LIEBERMAN STRAUS & SHREWSBERRY LLP
Alexis J. Rogoski, Esq.
Lisa L. Shrewsberry, Esq.
Richard J. Rogers, Esq.
Veronica L. Reed, Esq.
Mid-Westchester Executive Park
Seven Skyline Drive
Hawthorne, New York 10532

Attorneys for the Plaintiff


HITCHCOCK & CUMMINGS, L.L.P.
Terry Cummings, Esq.
Christopher B. Hitchcock, Esq.
757 Third Avenue, 25th Floor
New York, New York 10017

Attorneys for the Defendant

**LEISURE, District Judge:**

This is an insurance coverage action. Plaintiff, Quanta Specialty Lines Insurance Co. ("Quanta") moves, pursuant to Federal Rule of Civil Procedure 56, for an order of summary judgment declaring that it is not obligated to provide defendant, Investors Capital Corporation ("ICC") with coverage, in whole or in part, including defense and damages, for several related arbitrations in which ICC is a named Respondent. ICC cross-moves for summary judgment seeking coverage for the underlying arbitrations or, alternatively, rescission of the insurance policies Quanta issued to ICC. For the reasons set forth below, Quanta's motion for summary judgment is GRANTED and ICC's motion for summary judgment is DENIED.

## BACKGROUND

The Court assumes familiarity with the facts and allegations as stated in the Court's prior decisions in this action. See Quanta Specialty Lines Ins. Co. v. Investors Capital Corp., No. 06 Civ. 4624, 2008 WL 2545057 (S.D.N.Y. June 24, 2008) (Leisure, J.); Quanta Specialty Lines Ins. Co. v. Investors Capital Corp., No. 06 Civ. 4624, 2008 WL 1910503 (S.D.N.Y. Apr. 30, 2008) (Leisure, J.).

## I. The Parties' Insurance Contracts

Quanta is a surplus lines insurer incorporated in Indiana with its principal place of business in New York. (Joint Statement of Uncontested Facts As to Which the Parties Agree There Is No Genuine Issue to Be Tried ("Joint Statement") ¶¶ 2-3, 8.) Quanta was approved to write insurance placed in accordance with surplus lines insurance laws in most states, including Massachusetts and New York. (Id. ¶ 8.)

ICC is a securities broker/dealer incorporated in Delaware with its principal place of business in Massachusetts. (Id. ¶ 1.) Prior to December 31, 2004, ICC was insured against professional liability claims by Fireman's Fund Insurance Company under a policy obtained by a broker, CalSurance. (Id. ¶ 14.)

During 2004, ICC provided a completed CalSurance insurance application and authorized insurance broker William Gallagher Associates Insurance Brokers, Inc. ("WGA") to seek alternatives to its existing professional liability claims coverage when the policy came up for renewal. (Id. ¶¶ 15-16 & Ex. 5.) WGA is a licensed insurance broker and a licensed surplus lines insurance broker in Massachusetts. (Id. ¶ 17.) Quanta issued to ICC a Broker/Dealer and Registered Representative Professional Liability Policy, which provided coverage to ICC from December 31, 2004 to December 31, 2005 (the "Original Policy"). (Id. ¶

3

4.)   Thereafter, the policy was renewed for the period of

December 31, 2005 to December 31, 2006 (the "Renewal Policy").

(Id. ¶ 5.)

Section 1.A of the Original Policy and the Renewal Policy

(collectively, the "Policies") states, in relevant part, that:[1]

> The **Insurer** shall pay, on behalf of an
> **Insured**, **Damages** which the **Insured** becomes
> legally obligated to pay because of a **Claim**
> that is both made against the **Insured** and
> reported to the **Insurer** in writing during
> the **Policy Period** or Discovery Period, if
> applicable, for a **Wrongful Act** committed
> solely in the rendering or failing to render
> **Professional Services** for a **Client**,
> provided:
>
> > 1.   Such **Wrongful Act** occurred on or
> > after the **Retroactive Date**; and
> >
> > 2.   As of the inception date of this
> > Policy as stated in Item 3 of the
> > Declarations, no **Insured** had knowledge
> > or reasonable basis upon which to
> > anticipate that the **Wrongful Act** or any
> > **Interrelated Wrongful Act** could result
> > in a **Claim**.

(Id. Exs. 1 & 2 ("Policies"), § 1.A.)   The applicable

Retroactive Date is September 1, 1996.   (Policies § 2.R & Decl.

item 9.)

A threshold issue central to the resolution of this case is

the interpretation of the term "Claim" as defined in the

Policies.   The Policies define "Claim" as "a demand received by

any **Insureds** for **Damages** (including pleadings received in a

---

[1] The bolding of certain terms in the Policies' provisions is consistent with
the Policies' original text and not, unless noted otherwise, the Court's own
emphasis.   The bold terms are defined terms under the Policies.

4

civil litigation or arbitration) for an actual or alleged **Wrongful Act**." (Policies § 2.C.)  The definition specifically excludes "1. a demand for declaratory, injunctive or other non-monetary relief; 2. any form of criminal proceeding; 3. any proceeding commenced by a governmental or quasi-governmental official or agency or any self-regulatory official or agency . . . ." (Id.)  The interpretation of "Wrongful Act" also is at issue in the instant motions.  According to the Original Policy, a Wrongful Act is "a negligent act or omission . . . committed by an **Insured** in the rendering of **Professional Services**." (Original Policy § 2.T.)  The Renewal Policy modifies the definition of Wrongful Act to encompass acts by "an **Insured** or a **New York Representative**." (Renewal Policy § 2.T, as modified by Endorsement No. 12.)

Another provision at issue in the instant dispute is Section 6 of the Policies, entitled "Single Claim/Interrelated Wrongful Acts," which states that:

> All **Claims** based upon or arising out the [sic] same **Wrongful Act** or **Interrelated Wrongful Acts** shall be considered a single **Claim** and each such single **Claim** shall be deemed to have been made on the earlier of the following:
>
> A.   when the earliest **Claim** arising out of such **Wrongful Act** or **Interrelated Wrongful Acts** was first made; or
>
> B.   when notice was provided to the **Insurer** pursuant to Section 12 herein

> concerning a **Wrongful Act** giving rise
> to such **Claim.**

(Policies § 6.)  "Interrelated Wrongful Acts" are "any **Wrongful**

**Acts** that are:  1. similar, repeated or continuous; or 2.

connected by reason of any common fact, circumstance, situation,

transaction, casualty, event, decision or policy or one or more

series of facts, circumstances, situations, transactions,

casualties, events, decisions or policies."  (Id. § 2.L.)

Both Policies contain an "Exclusions" provision in Section

3 that disclaims coverage and absolves the insurer from paying

damages and defense expenses for any Claim:

> D.  arising  out  of,  based  upon  or  in
> consequence  of,  directly  or  indirectly
> resulting from or in any way involving:
>
> . . .
>
> 3.   a.  any  **Claim**,  demand,  suit,
>      proceeding  or  investigation  of
>      which  any  **Insured**  had  notice,
>      pending  on  or  prior  to  the
>      inception  date  of  the  **Policy**
>      **Period**  in  Item  3  of  the
>      Declarations  [12/31/2004  (Original
>      Policy)  and  12/31/2005  (Renewal
>      Policy)]; or
>
>      b. any fact, matter, circumstance,
>      situation,  transaction  or  event
>      underlying  or  alleged  in  such
>      demand, suit, proceeding, claim or
>      investigation;
>
>      regardless  of  the  legal  theory  upon
>      which such **Claim** is predicated;

(Id. § 3.)

Finally, the Policies contain a choice of law provision that provides "that the laws of the State of New York shall govern all issues pertaining to the meaning, interpretation and effect of" the Policies.  (Id. § 23.)

## II.  **Securities Division's Investigation of Joseph Jones**

On or about June 9, 2004, ICC received a telephone call from Shawn M. Pruett, a securities investigator from the North Carolina Division of Securities ("Securities Division"), requesting certain information regarding Joseph Jones ("Jones"), a former ICC registered representative who was associated with ICC from April 28, 1998 to December 31, 2001. (Joint Statement ¶¶ 31-32.)  The call was routed to Melissa Tarentino, an ICC attorney.  (Id. ¶ 32)  That conversation was followed by a letter request from Investigator Pruett to Ms. Tarentino dated June 9, 2004, for information about Jones.  (Id. ¶ 33 & Ex. 19.) The letter identified an IRA account held by an investor, Patricia Whitehead.  (Id. ¶ 34.)  Ms. Tarentino provided the information requested by letters dated June 14 and June 17, 2004. (Id. ¶ 35 & Exs. 20-21.)

On September 13, 2004, the Securities Division issued against Jones a Summary Order to Cease and Desist ("Summary Order") from selling BAB Productions securities ("BAB"), which were unregistered securities.  (Id. ¶ 37 & Ex. 23.)  The Summary

7

Order was not served on ICC.  (Id. ¶ 38.)   The Securities

Division entered a Final Order to Cease and Desist against Jones

on November 10, 2004.  (Id. ¶ 44 & Ex. 28.)   ICC advised Quanta

of the Securities Division's request for information regarding

Jones by e-mail dated April 21, 2006, almost two years after the

inquiry.  (Id. ¶ 36.)


## III. Alston Letter Complaining About Jones and ICC

ICC received a letter dated October 21, 2004 from Jay M.

Gallinger, Esq. ("Attorney Gallinger"), an attorney representing

an investor named Patricia Alston, claiming that Ms. Alston had

invested over $100,000 in BAB and that Jones, "under the

supervision of [ICC,] fraudulently sold these unregistered

securities to Ms. Alston."  (Id. ¶ 39 & Ex. 24 (the "Alston

Letter").)   The letter enclosed a copy of the September 13, 2004

Summary Order and sought reimbursement of Ms. Alston's

investment.  (Id.)   ICC's general counsel, Stephen Preskenis,

promptly investigated the allegations in the Alston Letter and

determined that, during the relevant time period, Ms. Alston had

not invested in BAB, but rather in an ICON income fund ("ICON").

(Id. ¶ 40.)   On October 26, 2004, Mr. Preskenis called Attorney

Gallinger to convey this information.  (Id.)   On November 8,

2004, Mr. Preskenis followed up with Attorney Gallinger by phone

and made notes of his conversation, which indicated that ICC can

8

disregard Ms. Alston's request for damages and that no further action was needed.  (Id. ¶ 41 & Ex. 25.)  An initial checklist prepared by Ms. Tarentino with respect to the Alston Letter had boxes checked for the complaint to be entered on a log and reported to ICC's insurer and for Jones's Form U-4/U-5[2] to be updated.  (Id. ¶ 42 & Ex. 26.)  On November 8, 2004, ICC filed an amendment to Jones's U-5 report reflecting Ms. Alston's complaint.  (Id. ¶ 43 & Ex. 27.)  Approximately one and a half years later, by letter dated May 8, 2006, ICC advised Quanta of the allegations in the Alston Letter, its investigation of those allegations, its determination that Ms. Alston never invested in BAB, and Ms. Alston's withdrawal of her claims.  (Id. ¶ 45 & Ex. 29.)

## IV.  Arbitrations Brought Against Jones and ICC

On August 12, 2005, ICC was served with a Statement of Claim in a NASD arbitration commenced by Lillie H. Green and three other investors (the "Green Arbitration") who purchased BAB through Jones, claiming to have lost most of their life savings as a result of Jones's actions.  (Id. ¶ 19.)  The Statement of Claim alleged, among other things, that Jones was

---

[2] Broker/dealers such as ICC must complete a Form U-4 (Uniform Application for Broker-Dealer Registration) to register with the National Association of Securities Dealers, Inc. ("NASD") and a Form U-5 (Uniform Termination Notice for Securities Industry Registration) when they terminate a registered employee, stating the reason for termination.  See Jordan v. Metro. Life Ins. Co., No. 03 Civ. 4110, 2004 WL 1752822, at *1 (S.D.N.Y. Aug. 4, 2004).

9

operating a Ponzi scheme by "'selling away' investment contracts issued by BAB Productions which were not registered securities" and that ICC failed to supervise him.  (Id. Ex. 7, ¶¶ 2, 50.) "Selling away" refers to a registered representative selling a product not approved by the broker/dealer. (See Aff. of Terence P. Cummings, Ex. G, 25:14-20 & Ex. H 21:3-18.)   Neither ICC nor Quanta dispute that BAB was not approved or authorized for sale by ICC.  (Id. ¶ 31.)

On August 15, 2005, ICC provided written notice to Quanta and WGA of the Green Arbitration, requesting that Quanta provide defense and damages coverage.  (Id. ¶ 20 & Ex. 8.)  By letters dated August 8, 2005 and October 3, 2005, Quanta reserved its rights to deny coverage for the Green Arbitration.  (Id. ¶¶ 21-22 & Exs. 9-10.)  In April 2006, a Fourth Amended Statement of Claim was filed in the Green Arbitration adding as a claimant Patricia Whitehead—the account holder at issue in the Securities Division's June 2004 investigation of Jones.  (Id. ¶ 23 & Ex. 11.)

In April 2006, ICC was served with a separate NASD arbitration demand filed by MacArthur Mitchell and his wife, also based on Jones's sale of investments in BAB (the "Mitchell Arbitration").  (Id. ¶ 24 & Ex. 12.)  Once again, the claimants alleged that ICC failed to supervise Jones, who "sold fraudulent investments in an enterprise known as BAB Productions to

hundreds of mostly-minority investors . . . ."  (Id. Ex. 12, ¶¶ 4, 13.)  On April 5, 2006, ICC provided notice to WGA of the Mitchell Arbitration and stated that it was related to the pending Green Arbitration.  (Id. ¶ 25 & Ex. 13.)  The next day, WGA provided notice of the Mitchell Arbitration to Quanta, stating that it was related to the Green Arbitration under Section 6 of the Policies.  (Id. ¶ 26 & Ex. 14.)

     The Green Arbitration eventually was divided into separate arbitrations—customers of ICC (the "Anderson Arbitration") and claimants who purchased BAB but did not have customer accounts with ICC while Jones was affiliated with the company (the "Anthony Arbitration").  (Id. ¶ 27.)  ICC provided notice to Quanta of the Anthony Arbitration on or about October 9, 2006, and advised Quanta of the change from the Green to the Anderson Arbitration on or about December 27, 2006.  (Id. ¶ 28 & Exs. 15- 16.)  Other NASD arbitrations have been filed or threatened against ICC from Jones's sale of BAB, including claims by Anna Anderson, Colbert Phillips, Mattie Greene, Dorothy and Wade Barnes, Maxine Hobbs, and Jessie Parker.  (Id. ¶ 29.)  Certain of these new claims were the subject of a January 30, 2007 notice to Quanta.  (Id. & Ex. 17.)  The foregoing matters together with the Green, Mitchell, Anderson, and Anthony Arbitrations are referred to collectively as the "Underlying Arbitrations."  (Id.)

By letters dated June 19, 2006, October 25, 2006, and
February 12, 2007, Quanta disclaimed defense and damages
coverage for the Underlying Arbitrations on the following three
grounds:   (1) pursuant to Section 6 of the Policies, the Alston
Letter and the Underlying Arbitrations are a single Claim deemed
made when the earliest Claim arising out of such Wrongful Act or
Interrelated Wrongful Acts first was made, which was the Alston
Letter in October 2004, before the inception of the December 31,
2004 Original Policy Period; (2) pursuant to Section 1 of the
Policies, as of the inception dates of the Policies, ICC had
knowledge or a reasonable basis upon which to anticipate that a
Wrongful Act or an Interrelated Wrongful Act could result in a
Claim based on the June 2004 Securities Division investigation,
Summary Order, and October 2004 Alston Letter; and (3) pursuant
to Section 3.D.3 of the Policies, the allegations in the
Underlying Arbitrations were the subject of the June 2004
Securities Division investigation, Summary Order, and October
2004 Alston Letter prior to the inception of the Policies. (Id.
¶¶ 47-49 & Exs. 30-32.)


**V. Procedural History**

On June 15, 2006, Quanta filed an action in this Court
seeking a declaratory judgment that, under the terms of the
Policies, coverage should not be afforded to ICC for the Green

12

and Mitchell Arbitrations. (Quanta's Compl. for Decl. J., dkt. no. 1.) ICC filed its answer on July 28, 2006, asserting seven affirmative defenses and six counterclaims. (ICC's Answer, Affirmative Defenses, and Countercls., dkt. no. 6.)

By Opinion and Order dated April 30, 2008, this Court granted in part and denied in part Quanta's motion to dismiss and/or strike ICC's counterclaims and certain affirmative defenses. See Quanta, 2008 WL 1910503. Specifically, the Court dismissed ICC's first two counterclaims seeking rescission of the Policies as violative of New York's group insurance and excess line requirements, holding that ICC does not have a private right of action to enforce these provisions of the New York Insurance Law. See id. at *5-6. The Court also dismissed ICC's third counterclaim for rescission alleging that Quanta was an unauthorized insurer doing business in New York in violation of Section 1102 of the New York Insurance Law on the ground that a judicially created penalty was not one of the penalties envisioned by the Legislature in drafting Section 1102. See id. at *6. The Court did not dismiss ICC's fourth, fifth, and sixth counterclaims seeking declaratory judgment, specific performance, and damages for breach of contract. See id. The Court declined to strike ICC's first affirmative defense—failure to properly state a claim upon which relief can be granted—and seventh affirmative defense—that Section 6 of the Policies does

not preclude coverage.  Id. at *7.  However, the Court struck ICC's fourth and fifth affirmative defenses because they were premised improperly on claims that the Policies were issued in contravention of New York insurance laws.  See id.  Finally, the Court denied ICC's motion to compel pre-answer security from Quanta and denied as futile ICC's request for leave to amend its answer to add an affirmative defense.  Id. at *7-10.  To the extent that the parties raise these same arguments in their motions for summary judgment, the Court's April 30, 2008 ruling controls.

On June 24, 2008, the Court issued a Memorandum Order denying ICC's motion for reconsideration of the Court's April 30, 2008 decision.  Now pending before the Court is each party's motion for summary judgment.

**DISCUSSION**

The Court begins by addressing the standards for resolving motions for summary judgment.  It then addresses the appropriate choice of law for this dispute.  Next, the Court provides the legal standard under New York law for interpreting insurance contracts.  Finally, the Court analyzes the policy provisions at issue in this dispute and determines whether their language bars coverage for defense and damages expenses for ICC.

14

## I. Applicable Law

A. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure allows for the entry of summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment carries the burden of showing that no genuine factual dispute exists and, in assessing the record to determine whether there is a genuine issue as to a material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. Atl. Mut. Ins. Co., Inc. v. CSX Lines, L.L.C., 432 F.3d 428, 433 (2d Cir. 2005); Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004) (Kearse, J.); Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc., 182 F.3d 157, 160 (2d Cir. 1999). "If there is any evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper." Westinghouse Credit Corp. v. D'Urso, 278 F.3d 138, 145 (2d Cir. 2002). Of course, "'the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion

for summary judgment; the requirement is that there be no genuine issue of material fact.'" Lang v. Ret. Living Publ'g Co., Inc., 949 F.2d 576, 580 (2d Cir. 1991) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (emphasis in original)). A dispute as to a material fact is genuine only if "'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" N.Y. Stock Exch., Inc. v. N.Y., N.Y. Hotel LLC, 293 F.3d 550, 554 (2d Cir. 2002) (quoting Anderson, 477 U.S. at 248, 106 S. Ct. 2505).

Once the movant has demonstrated that no material facts are in dispute, the burden shifts to the non-movant to set forth specific facts indicating that a genuine issue exists for trial. Cifarelli v. Vill. of Babylon, 93 F.3d 47, 51 (2d Cir. 1996). "However, mere conclusory allegations, speculation or conjecture" are not sufficient to resist summary judgment and "a non-moving party may not rest on the pleadings but must further set forth specific facts in the affidavits, depositions, answers to interrogatories, or admissions showing a genuine issue exists for trial." Id.

Where, as here, the Court simultaneously is considering multiple motions for summary judgment, the Court applies the same summary judgment standard as that used for deciding individual motions for summary judgment. See Penguin Group

16

(USA) Inc. v. Steinbeck, 537 F.3d 193, 200 (2d Cir. 2008)
(explaining that facts must be construed in the light most
favorable to the non-moving party for each cross-motion for
summary judgment); Morales v. Quintel Entm't, Inc., 249 F.3d
115, 121 (2d Cir. 2001) ("[E]ach party's motion must be examined
on its own merits, and in each case all reasonable inferences
must be drawn against the party whose motion is under
consideration."). A district court is not compelled to find
summary judgment merely because all parties are moving for
summary judgment. Morales, 249 F.3d at 121.

## B. New York is the Appropriate Choice of Law

For the first time in its opposition brief,[3] ICC contends
that the choice of law provision in the Policies, which calls
for the application of New York law, "has no relationship to the
agreement and is not supported by the public policy of New
York." (Def.'s Mem. of Law in Opp'n to Pl.'s Mot. for Summ. J.
and in Further Supp. of Def.'s Mot. for Summ. J. ("ICC Opp'n")
15.) ICC requests that this Court apply New York's choice of

---

[3] The parties stipulated to file a single memorandum in response to each
motion for summary judgment and to dispense with reply memoranda. (ICC Opp'n
1 n.1.) ICC, with Quanta's consent, submitted a supplemental affidavit in
March 2008 notifying the Court of a final award in the Anthony Arbitration.
In October 2008, the Court received letters from the parties regarding a case
decided by the New York Appellate Division. The Court incorporates all the
submissions, absent the October 2008 letters, into the instant motions.

law rules, which, ICC claims, require the application of Massachusetts law to this case.  (Id.)

In cases involving a contract with an express choice of law provision, New York law is clear:  Absent fraud, violation of public policy, or lack of a reasonable basis for choosing the law of that jurisdiction, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction.  See Aramarine Brokerage, Inc. v. OneBeacon Ins. Co., 307 Fed. Appx. 562, 564 (2d Cir. 2009); Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd., 230 F.3d 549, 556 (2d Cir. 2000); Freedman v. Chem. Constr. Corp., 43 N.Y.2d 260, 265 n.*, 372 N.E.2d 12 (1977).

The Court finds ICC's request to apply Massachusetts law to this action meritless.  First, ICC has waived its choice of law argument by applying New York law in support of its claims throughout its briefing, but for 3.5 pages near the end of its opposition brief.  See City of Livonia Employees' Ret. Sys. v. Essner, No. 07 Civ. 10329, 2009 WL 1809984, at *3 n.1 (S.D.N.Y. June 25, 2009).  Second, even if timely, ICC's argument fails where both ICC and Quanta signed the Original and Renewal Policies, each containing the following unambiguous choice of law provision:  "The **Insurer** and the **Insureds** agree that the laws of the State of New York shall govern all issues pertaining to the meaning, interpretation and effect of this Policy and its

terms and provisions . . . ."  (Policies § 23.)  The instant
motions involve contract interpretation—a matter clearly within
the parties' choice of law provision.  (Id.)

Third, pursuant to New York's choice of law rules, the
state selected by the parties "has sufficient contacts with the
transaction," since New York is Quanta's principle place of
business.  Aramarine, 307 Fed. Appx. at 564 (citation and
internal quotation marks omitted); see also Joint Statement ¶ 3.
However, ICC claims that "public policy strongly disfavors
Quanta's reliance on New York's substantive law" because Quanta,
which is incorporated in Indiana, maintained its principal place
of business in New York and conducted a nationwide insurance
business in contravention of New York laws.  (ICC Opp'n 14.)
There is no dispute that the Policies were issued in accordance
with Massachusetts surplus lines laws.  (See id.; Pl.'s Mem. of
Law in Supp. of Its Mot. for Summ. J. ("Quanta Mem.") 21.)  The
Court, therefore, must determine whether the public policy
underlying the New York Insurance Laws that regulate excess
lines brokers, see N.Y. Ins. Law §§ 1102, 2105, 2118, 2130, "is
so fundamental that it should override the parties' choice of
law."  Welsbach Elec. Corp. v. MasTec N. Am., Inc., 7 N.Y.3d
624, 627, 859 N.E.2d 498 (2006).

This Court already has held that, not only does ICC not
have a private right of action to assert claims under the above

New York Insurance Laws, the rules ICC points to "do not affect the substance of the underlying insurance contract between an unauthorized insurer [Quanta] and its insured [ICC]." Quanta, 2008 WL 1910503, at *5. Therefore, any purported violation of New York public policy through the violation of the aforementioned insurance laws is not "so fundamental that it should override the parties' choice of [New York] law." Welsbach, 7 N.Y.3d at 627 (holding that New York's public policy against pay-if-paid contracts is not so fundamental that it should override the parties' choice of Florida law, which permits pay-if-paid contracts); see also Cooney v. Osgood Mach., Inc., 81 N.Y.2d 66, 79, 612 N.E.2d 277 (1993). Because this Court rejects ICC's belated request, which is contrary to the unambiguous language of the Policies, to apply Massachusetts law, the Court need not consider ICC's argument that the Alston Letter does not constitute a Claim under Massachusetts law. For the foregoing reasons, the Court declares that New York, and not Massachusetts, law applies to the resolution of the instant motions.


C. Interpretation of Insurance Contracts Under New York Law

Under New York law, the interpretation of a contract "is a matter of law for the court to decide." Seneca Ins. Co. v. Kemper Ins. Co., No. 02 Civ. 10088, 2004 WL 1145830, at *4

20

(S.D.N.Y. May 21, 2004) (Leisure, J.) (quoting Int'l Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 83 (2d Cir. 2002)). Summary judgment may be granted where the words of a contract convey a definite and precise meaning without ambiguity. Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992).

In deciding how to interpret an insurance contract, a court undertakes a three-part analysis. First, the Court must determine "whether the contract is unambiguous with respect to the question disputed by the parties." Int'l Multifoods Corp., 309 F.3d. at 83. If the Court determines that a contract is not ambiguous, it "'should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence' and . . . may then award summary judgment." Id. (quoting Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, 136 F.3d 82, 86 (2d Cir.1998)). An insurance contract is ambiguous where its terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Id. (citation and internal quotation marks omitted). "The language of a contract is not made ambiguous simply because the parties urge

21

different interpretations." Seiden, 959 F.2d at 428.  Second,

if "a court concludes that an insurance provision is ambiguous,

the court may accept any available extrinsic evidence to

ascertain the meaning intended by the parties during the

formation of the contract." Morgan Stanley Group Inc. v. New

Eng. Ins. Co., 225 F.3d 270, 275-76 (2d Cir. 2000) (citation and

internal quotation marks omitted).  Third, "[i]f the extrinsic

evidence does not yield a conclusive answer as to the parties'

intent, [the] court may apply other rules of contract

construction, including the rule of contra proferentem, which

generally provides that where an insurer drafts a policy any

ambiguity in [the] . . . policy should be resolved in favor of

the insured." Id. at 276 (citation and internal quotation marks

omitted).

Where insurance contracts contain an exclusion provision,

as do the Policies at issue here, "'[t]he insurer generally

bears the burden of proving that the claim falls within the

scope of an exclusion . . . [by] establish[ing] that the

exclusion is stated in clear and unmistakable language, is

subject to no other reasonable interpretation, and applies in

the particular case.'" Seneca, 2004 WL 1145830, at *10 (quoting

Vill. of Sylvan Beach v. Travelers Indem. Co., 55 F.3d 114, 115-

16 (2d Cir. 1995)); see also Seaboard Sur. Co. v. Gillette Co.,

64 N.Y.2d 304, 311, 476 N.E.2d 272 (1984) (stating that

exclusions "are not to be extended by interpretation or
implication, but are to be accorded a strict and narrow
construction").

## II.  The Parties' Motions for Summary Judgment

Quanta seeks a motion for summary judgment declaring that
no defense and damages coverage is available to ICC for the
Underlying Arbitrations on the grounds that:  (A) pursuant to
Section 6 of the Policies, the Alston letter and the Underlying
Arbitrations are a single Claim deemed made when the earliest
Claim first was made, which was the Alston letter in October
2004, before the inception of the December 31, 2004 Original
Policy Period; (B) pursuant to Section 1 of the Policies, as of
the inception dates of the Policies, ICC had knowledge or a
reasonable basis upon which to anticipate that a Wrongful Act or
Interrelated Wrongful Acts could result in a Claim based on the
June 2004 Securities Division investigation, October 2004 Alston
Letter, and Summary Order; and (C) pursuant to Section 3,
Exclusion D.3 of the Policies, ICC had notice that the
allegations in the Underlying Arbitrations were the subject of
the June 2004 Securities Division investigation, October 2004
Alston Letter, and Summary Order.  (See Quanta Mem. 7, 14, 17.)

Simultaneous with Quanta's motion for summary judgment, ICC
submits a cross-motion for summary judgment with respect to

Quanta's complaint and ICC's counterclaims.  In support of its
motion, ICC argues that:  (A) the Alston Letter is not a "Claim"
within the meaning of the Policies; (B) the North Carolina
Securities Division investigation, Alston Letter, and Summary
Order did not lead ICC to have knowledge or a reasonable basis
to anticipate a Claim as of the inception dates of the Policies;
and (C) the Underlying Arbitrations did not arise from the
Securities Division investigation, Alston Letter, or Summary
Order, making Exclusion D.3 inapplicable.  (ICC Opp'n 1.)
Accordingly, ICC requests that summary judgment be entered on
its counterclaims for coverage for the Underlying Arbitrations
because the arbitrations arose from alleged Wrongful Acts within
the meaning of the Policies, a Claim first was made with respect
to such Wrongful Acts during the Policy Period, and no
applicable exclusion for coverage applies.  (ICC Opp'n 1-2.)
Alternatively, ICC asks for summary judgment on its
counterclaims for rescission on the grounds that the Policies
were issued in contravention of New York insurance laws.  (Mem.
of Law in Supp. of Def. ICC's Mot. for Summ. J. With Respect to
Pl.'s Compl. and Def.'s Countercls. ("ICC Mem.") 23-24.)  ICC
also asks the Court to conduct an inquest hearing on the issue
of ICC's damages, which, as of March 2008—the date of
supplemental briefing on the instant motion—totaled
$1,389,973.28 in settlement costs, attorneys fees, and other

costs in connection with the Underlying Arbitrations.

(Supplementary Aff. of Steven C. Preskins ¶ 4.)

The Court begins by analyzing the policy provisions at issue in this coverage dispute—Section 6, Section 1, and Section 3, respectively. The Court then addresses ICC's counterclaims for coverage and, alternatively, for rescission.

A. Pursuant to Section 6 of the Policies, the Alston Letter is a Claim Based Upon or Arising from the Same Wrongful Act or Interrelated Wrongful Acts as the Underlying Arbitrations, Making It a "Claim First Made" Prior to the Policy Period

Quanta contends that the October 2004 Alston Letter constitutes a "Claim" against ICC first made prior to the inception of the Original Policy, thereby precluding coverage for the Underlying Arbitrations. (Quanta Mem. 6.) Quanta rests its argument on Section 6 of the Policies, titled "Single Claim/Interrelated Wrongful Acts," and asserts that the Green Arbitration is interrelated to the Alston Letter and, therefore, constitutes a Claim made prior to the coverage period of the Policies, resulting in no coverage to ICC and summary judgment for Quanta. (Id. 1-2.)

ICC responds that the Underlying Arbitrations are not related to the Alston Letter because (1) the Alston Letter is not a "Claim"; and (2) since the letter was withdrawn after ICC's investigation determined that the allegations did not

25

involve Jones's sale of BAB securities, the behavior alleged
does not constitute a "Wrongful Act" under Section 6 of the
Policies.  (ICC Mem. 18.)

Because the definition of "Claim" clearly excludes "any
proceeding commenced by a governmental or quasi-governmental
official or agency" (Policies § 2.C.3), the parties do not
dispute that the Securities Division's June 2004 investigation
and subsequent Summary and Final Orders to Cease and Desist do
not constitute a Claim.  Therefore, the Court need only
determine whether the Alston Letter is a "Claim."  In deciding
whether the Alston Letter is a Claim first made, the Court must
determine:  (1) whether the term "Claim," as defined by the
Policies, is ambiguous; (2) if "Claim" is unambiguous, whether a
withdrawn written demand qualifies as a "Claim"; and (3) if so,
whether the Alston Letter alleges a "Wrongful Act" or
"Interrelated Wrongful Acts" as those alleged in the Underlying
Arbitrations such that the Alston Letter qualifies as a Claim.

### 1. The Term "Claim," as Defined by the Policies, is Not Ambiguous

As a threshold matter, the Court must determine whether the
term "Claim" is ambiguous as defined by the Policies.  See Parks
Real Estate Purchasing Group v. St. Paul Fire and Marine Ins.
Co., 472 F.3d 33, 42 (2d Cir. 2006).  If it is unambiguous, the

Court applies its plain meaning; if it is ambiguous, the Court
may consider extrinsic evidence to determine its meaning.  See
Int'l Multifoods Corp., 309 F.3d at 83; Morgan Stanley, 225 F.3d
at 275-76.

ICC contends that the Policies' definition of "Claim" is
ambiguous and, therefore, should render ambiguous the contract
provisions that contain the term.  (ICC Mem. 21.)  Claim is
defined as "a demand received by any **Insureds** for **Damages**
(including pleadings received in a civil litigation or
arbitration) for an actual or alleged **Wrongful Act**."  (Policies
§ 2.C.)  ICC argues that because the Policies define Claim as "a
demand for damages" as opposed to "any demand for damages," the
Policies leave open to interpretation whether a complaint for
damages that was withdrawn meets the definition.  (ICC Mem. 21.)

Under New York law, an ambiguity exists where the terms of
an insurance contract could suggest more than one meaning when
viewed objectively.  See Parks Real Estate, 472 F.3d at 42.
Courts in this Circuit, including this Court, consistently have
found the term "claim," in the context of insurance contracts,
unambiguous.  See Seneca, 2004 WL 1145830, at *5 (Leisure, J.)
(holding that a letter written to an insured alleging violations
of law and requesting money damages constitutes a "claim," and
observing that courts have found the term "claim," as used in
liability insurance policies, unambiguous and generally means a

demand by a third party against the insured for money damages or other relief), aff'd by 133 Fed. Appx. 770 (2d Cir. 2005); Andy Warhol Found. for Visual Arts, Inc. v. Fed. Ins. Co., 189 F.3d 208, 215 (2d Cir. 1999) (defining "claim" under New York law, where "the policy contains no definition of the term," as "an assertion by a third party that in the opinion of that party the insured may be liable to it for damages [that are] within the risks covered by the policy." (citation and internal quotation marks omitted)); Home Ins. Co. of Ill. (N.H.) v. Spectrum Info. Techs., Inc., 930 F. Supp. 825, 846 (E.D.N.Y. 1996) ("Courts have found that the term 'claim' as used in liability insurance policies is unambiguous and generally means a demand by a third party against the insured for money damages or other relief owed.").[4]

Consistent with the caselaw, the Policies at issue here define Claim "as a demand received . . . for **Damages**." (Policies § 2.C.)   This Court, therefore, like the numerous courts in this Circuit, holds that the term "Claim" in the instant Policies is unambiguous and will be interpreted according to its plain meaning without consideration of

---

[4] ICC asks the Court to extrapolate from Spectrum's interpretation of the word "proceeding" to interpret the term "Claim."   (ICC Opp'n 10 n.6; see also Spectrum, 930 F. Supp. at 838 (stating that "the term 'proceeding' is, at best, here ambiguous").)   The Court declines to do so where the term at issue—"Claim"—has been analyzed and found unambiguous by numerous courts, including Spectrum.   See Spectrum, 930 F. Supp. at 846 (listing nearly a dozen cases finding "claim" to be unambiguous and to mean a demand for damages).

extrinsic evidence or application of contra proferentem.   See
Morgan Stanley, 225 F.3d at 275-76.


### 2. The Term "Claim" Encompasses a Withdrawn Written Demand

ICC's assertion that the term "Claim" is ambiguous rests on
the premise that the term does not encompass withdrawn
complaints.  (See ICC Opp'n 11.)  However, the definition of
"Claim" expressly includes "actual or alleged" wrongful acts,
thereby contemplating that the allegations ultimately may prove
erroneous.  (See Policies § 2.C (emphasis added).)  If ICC's
position were correct—that an insurer has no duty to defend a
groundless demand because it is not a "Claim"—an insured would
be left defenseless whenever a claimant pursued unfounded
allegations.  Additionally, ICC's argument that "Claim" is open
to interpretation because the Policies define Claim as "a demand
for damages" instead of "any demand for damages," is misguided.
(See ICC Mem. 21.)  Even if the provision substituted "any" for
"a," it still would encompass "actual or alleged" wrongful acts.
(See Policies § 2.C.)

Because the Policies' definition of Claim explicitly
encompasses actual or alleged wrongful acts, a written demand
for damages that later is withdrawn meets the definition.


### 3. The Alston Letter Alleges a "Wrongful Act"

29

Now that the Court has determined that the term "Claim" is unambiguous and that a written demand that later is withdrawn meets the definition, it turns to ICC's next argument:  that the Alston Letter is not a Claim because it does not allege a "Wrongful Act."  ICC's argument rests on the fact that the Alston Letter erroneously described Ms. Alston's investment as being in BAB, when really it was in ICON, and that the letter was withdrawn approximately two weeks after being submitted. (ICC Mem. 18.)  Because the Summary Order was enclosed with the Alston Letter, ICC further contends that "to the extent [the Summary Order] involved errors or omissions by Jones is irrelevant because Jones was not an Insured under the policy." (Id.)

The Policies define "Wrongful Act" as "a negligent act or omission . . . committed by an **Insured** [or a **New York Representative**] in the rendering of **Professional Services**." (Original Policy § 2.T; Renewal Policy § 2.T, as modified by Endorsement No. 12.)  There is no dispute that ICC is an Insured Broker/Dealer under the Policies (see Policies §§ 2.I-J) and that Jones is not an Insured Registered Representative under the Policies because he was not affiliated with ICC during either the Original or Renewal Policy Period (Joint Statement ¶ 31 & Ex. 10 at 4 (Quanta Reservation of Rights Letter Oct. 3, 2005 ("Mr. Jones . . . is not an 'Insured' under the policy and

30

Quanta owes him no duties thereunder.")); ICC Mem. 15 n.14, 18.)
The parties also do not dispute the meaning of the term
"Professional Services." (Original Policy § 2.O.2, as modified
by Endorsement No. 11; Renewal Policy § 2.O.2, as modified by
Endorsement No. 12.)   Therefore, the Court need only determine
whether, notwithstanding the Alston Letter's erroneous claims
and subsequent withdrawal, the letter alleged a "Wrongful Act."

     The Alston Letter alleged that "Mr. Jones under the
supervision of Investors Capital Corporation fraudulently sold
[BAB Productions] unregistered securities to Ms. Alston" and
"[s]ince Joseph Jones sold these securities to . . . Ms. Alston
while Mr. Jones was affiliated with your corporation you are
responsible for his securities violations."   (Joint Statement
Ex. 24.)   This allegation clearly amounts to a negligent
supervision and respondeat superior claim against ICC, either of
which qualifies under the Policies as "a negligent act or
omission . . . committed by an **Insured**."   (Policies § 2.T.)
Therefore, because the Alston Letter articulated a negligent act
or omission claim against ICC, it satisfies the Wrongful Act
definition under Section 2.T.


### 4. The Alston Letter is a Claim

Because the Court has determined that the definition of
Claim is unambiguous and encompasses a withdrawn written demand,

and that the Alston Letter alleges a Wrongful Act, it holds that the Alston Letter constitutes a Claim under the Policies.

ICC's contention that the Alston Letter never became a Claim is unavailing for several reasons. First, the Court already has determined that "Claim" encompasses withdrawn demands. Second, ICC treated the Alston Letter as a Claim by noting it on a complaint log as being reportable to ICC's then-professional liability insurer, Fireman's Fund, and updating Jones's Form U-5 to reflect the Letter's allegations. Notably, ICC had the option to mark on the complaint log that it did not need to report the complaint to its insurer and provide a reason why. (See Joint Statement Ex. 26 ("_X_ Report to E & O [Errors and Omissions insurer] . . . Not Required ___ Reason ___").) Had ICC determined that it need not report the Alston Letter to Fireman's Fund, as it argues now, (see ICC Mem. 11), ICC would have checked off "Not Required" and provided a "Reason." Third, nothing in the definition of Claim requires that a lawsuit or other proceeding be threatened, so ICC's argument that the Alston Letter is not a Claim because it "did not threaten a lawsuit or other proceeding, but merely requested that ICC contact Ms. Alston directly to make arrangements to reimburse her 'for her investments [in] BAB Productions made through [ICC]'" is without merit. (ICC Mem. 9; Joint Statement Ex. 24.)

Because the Policies' definition of "Claim" encompasses "alleged" Wrongful Acts, because the Alston Letter alleges such a Wrongful Act, and because there is no dispute that the Letter includes a demand for damages and was received by ICC, the Court holds, as a matter of law, that the Alston Letter is a Claim under the Policies.

### 5. The Alston Letter Is Based On, Or Arises Out Of, the Wrongful Acts Alleged in the Underlying Arbitrations

The Court already has determined that the Alston Letter is a Claim—that is, a demand for damages for an alleged Wrongful Act; now it turns to whether the allegations in the Alston Letter arise from the same Wrongful Act or Interrelated Wrongful Acts alleged in the Underlying Arbitrations.   Section 6 of the Policies provides that:  "All **Claims** based upon or arising out [of] the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be considered a single **Claim** and each such single **Claim** shall be deemed to have been made . . . when the earliest **Claim** . . . was first made." (Policies § 6.)   The parties do not dispute that the Underlying Arbitrations are related to ICC's alleged failure to supervise Jones's sale of BAB securities.   (See Quanta Mem. 13-14; ICC Mem. 17.)   The parties do dispute whether the Alston Letter is interrelated with the Underlying Arbitrations.   Quanta contends that the Underlying Arbitrations and the Alston Letter

are one Claim first made in October 2004—prior to the commencement of the Quanta Policies—because the Alston Letter involved the same sale of BAB securities by the same representative as did the Underlying Arbitrations.  (Quanta Mem. 13-14.)  ICC, on the other hand, maintains that because Ms. Alston never invested in BAB, her complaint was withdrawn, and her letter referred to the late 1999 and early 2000 period, while the attached Summary Order concerned the time period after Jones's affiliation with ICC, the Alston Letter is not a Claim related to the Underlying Arbitrations.  (ICC Mem. 14, 18.)

To establish that a prior Claim is interrelated with a subsequent Claim, the Claims must share a "sufficient factual nexus."  See Zahler v. Twin City Fire Ins. Co., 04 Civ. 10299, 2006 U.S. Dist. LEXIS 14263, at *20 (S.D.N.Y. Mar. 30, 2006) (Preska, J.) (citing the sufficient factual nexus test with approval and stating that "[t]wo courts in this district, presented with successive, related claims to which interrelated wrongful acts provisions applied, both held, as this Court now holds, that the first insurer's coverage applies"); Seneca, 2004 WL 1145830, at *9 (holding "that there is a sufficient factual nexus between the Wrongful Acts from which [two different Claims] arise to justify their classification as Interrelated Wrongful Acts"); Zunenshine v. Executive Risk Indem., Inc., No. 97 Civ. 5525, 1998 U.S. Dist. LEXIS 12699, at *12 (S.D.N.Y. Aug.

17, 1998) (stating that courts in the Second Circuit that "have had occasion to interpret 'pending litigation' or 'prior notice' exclusions in 'claims made' insurance policies governed by New York law . . . have focused on 'whether there was a sufficient factual nexus' between the two [claims]").  A sufficient factual nexus exists where the Claims "are neither factually nor legally distinct, but instead arise from common facts" and where the "logically connected facts and circumstances demonstrate a factual nexus" among the Claims. Seneca, 2004 WL 1145830, at *9.

The Court holds that, pursuant to the caselaw and the relevant policy provisions, the Alston Letter shares a sufficient factual nexus with the Underlying Arbitrations. Specifically, the Alston Letter alleges that "Mr. Jones under the supervision of Investors Capital Corporation fraudulently sold [BAB Productions] unregistered securities to Ms. Alston" and "[s]ince Joseph Jones sold these securities to . . . Ms. Alston while Mr. Jones was affiliated with [ICC] . . . [ICC is] responsible for his securities violations."  (Joint Statement Ex. 24.)  This allegation shares a common nexus with the allegations in the Underlying Arbitrations—namely, Jones's sales of the unregistered BAB securities and ICC's failure to supervise such sales.  (See, e.g., Green Arbitration Consolidated Statement of Claim, Joint Statement Ex. 7, ¶ 50 ("Investors Capital . . . failed to supervise Jones to see that

Claimants' account[s] were properly handled and that unlawful
practices did not occur."); Green Arbitration Fourth Amended
Statement of Claim, Joint Statement Ex. 11, ¶¶ 99-100 ("[ICC]
had a duty to supervise . . . Joseph Jones and to ensure that he
did not engage in the practice of 'selling away' unregistered
securities . . . . [ICC] failed to supervise Jones to see that
Claimants' account[s] were properly handled and that unlawful
practices did not occur."); Mitchell Arbitration, Joint
Statement Ex. 12, ¶¶ 4 & 13.A ("During the period from 2000
through the end of 2002, . . . Mr. Jones sold fraudulent
investments in an enterprise known as BAB Productions . . . .";
"ICC . . . failed to properly supervise Mr. Jones while Mr.
Jones was a representative of [the] firm.").)

     ICC reasons that because the Alston Letter erroneously
asserted that Ms. Alston invested through Jones in BAB, rather
than ICON securities, and ultimately was withdrawn, the
allegations in the letter arise neither from the same Wrongful
Act nor Interrelated Wrongful Acts as the Underlying
Arbitrations.  Although ICC's investigation determined that Ms.
Alston did not invest in BAB, the accuracy of the allegations—or
lack thereof—does not erase the fact that they were made and
were consistent with the factual allegations in the Underlying
Arbitrations.  Moreover, the time period of BAB purchases cited
in several of the Underlying Arbitrations coincides with the

late 1999 and early 2000 time period cited in the Alston Letter. (See, e.g., Green Arbitration Fourth Amended Statement of Claim, Joint Statement Ex. 11, ¶ 73 ("[LaDoris Leonard] lost $199,500 when Jones convinced her to switch to BAB contracts starting November 4, 1999."); id. ¶ 75 ("[Excell and Alma Finch] were solicited to start buying BAB contracts when Mr. Jones was a registered representative of Investors Capital in March of 2000."); id. ¶ 79 ("Jones . . . proceeded to sell [Gloria Mallory] a BAB contract on March 16, 1999 for $25,000 when he was a registered representative of Investors Capital."); id. ¶ 92 ("Mary Henderson invested $60,000 into BAB on July 19, 1999 when Jones was with Investors Capital.  On December 15, 2000, she invested another $60,000.").)

The Court, therefore, holds as a matter of law that pursuant to the clear language of the Alston Letter and the Underlying Arbitrations, the allegations made in the Alston Letter are based on, or arise out of, the Wrongful Acts alleged in the Underlying Arbitrations such that the Alston Letter is deemed a Claim first made prior to the inception of the Policies.  Because ICC has failed to show that a genuine issue of material facts exists with respect to the applicability of Section 6, the Court grants summary judgment in favor of Quanta.

Quanta brings two additional arguments in favor of denying coverage to ICC.  Although the Court need not consider Quanta's

additional arguments, it will analyze them for purposes of completeness.

B. <u>As of the December 31, 2004 Inception Date of the Original Policy, ICC had Knowledge or a Reasonable Basis Upon Which to Anticipate that a Wrongful Act or Interrelated Wrongful Act Could Result in a Claim Pursuant to Section 1 of the Policies</u>

Quanta contends that, even if the Underlying Arbitrations and the Alston Letter are not deemed a single Claim, coverage still is not available because ICC, prior to the inception of the Original Policy, had knowledge or a reasonable basis on which to anticipate that a Wrongful Act or an Interrelated Wrongful Act could result in a Claim.  (Quanta Mem. 14.)  The basis for Quanta's argument lies in the conditions contained in the Policies' insuring clause, which grants coverage for damages for a Claim made against the Insured during the Policy Period for a Wrongful Act, "provided:  1. Such **Wrongful Act** occurred on or after the **Retroactive Date** [9/1/1996]; and 2. As of the inception date of this Policy [12/31/2004 (Original Policy) and 12/31/2005 (Renewal Policy)] . . . no **Insured** had knowledge or reasonable basis upon which to anticipate that the **Wrongful Act** or any **Interrelated Wrongful Act** could result in a **Claim**."  (Id.; Policies § 1.A.)  The first condition of the exclusion—that the Wrongful Act (that is, ICC's alleged failure to supervise Jones) occurred on or after September 1, 1996—is not

at issue.  (See ICC Mem. 12 n.13.)  However, the second
condition—whether ICC had prior knowledge that a future Claim
could result—is at issue.  Quanta contends that in light of the
June 2004 Securities Division investigation, October 2004 Alston
Letter, and enclosed Summary Order, ICC—prior to the December
31, 2004 inception date of the Original Policy—had knowledge or
a reasonable basis on which to anticipate that a Wrongful Act or
any Interrelated Wrongful Act could result in a Claim.  (Quanta
Mem. 16.)

### 1. Legal Standard for Interpreting Prior Knowledge Exclusions

To reiterate, under New York law, if an insurance policy is
unambiguous, a court applies its plain terms.  Int'l Multifoods
Corp., 309 F.3d. at 83.  When an insurer relies on a policy
exclusion to deny coverage, the insurer bears the burden of
proving that the exclusion applies.  See Seneca, 2004 WL
1145830, at *10.

"No court in New York, whose law provides the rule of
decision in this case, has addressed the question" of what
standard applies in determining whether an insured would have
expected a Claim based on the known facts.  Westport Ins. Corp.
v. Goldberger & Dubin, P.C., 255 Fed. Appx. 593, 594 (2d Cir.
2007), aff'g No. 04 Civ. 4384, 2006 U.S. Dist. LEXIS 31329, at

*9, 16 (S.D.N.Y. Mar. 3, 2006) (Jones, J.) (recognizing that "[c]ourts interpreting New York law have not yet directly addressed the issue of whether an objective or subjective standard applies to policy language like that in [the exclusion at issue]" but applying an objective standard and holding that a reasonable person aware of the facts reasonably could expect that a claim might result).  In applying an objective standard, the district court in Westport relied on the Western District of Pennsylvania's analysis of a similar exclusion under Pennsylvania law.  See Westport, 2006 U.S. Dist. LEXIS 31329, at *11 (adopting analysis in Mt. Airy Ins. Co. v. Thomas, 954 F. Supp. 1073, 1080 (W.D. Pa. 1997) (applying an objective standard and predicting, "based on [a] review of all relevant case law, that the Pennsylvania Supreme Court would adopt an objective standard in determining whether a malpractice claim is reasonably foreseeable given the facts known or possessed by the insured"), summarily aff'd by 149 F.3d 1165 (3d Cir. 1998)).[5]

Since Mt. Airy, the Third Circuit has elucidated the method for evaluating prior knowledge provisions under Pennsylvania

---

[5] In addition to the district court in Westport, other district courts in this Circuit have applied an objective standard under New York law when faced with similar "prior knowledge" exclusions in the attorney malpractice insurance context.  See, e.g., United Nat'l Ins. Co. v. Granoff, Walker & Forlenza, P.C., 598 F. Supp. 2d 540, 547 (S.D.N.Y. 2009) (Chin, J.) (applying an objective standard in determining whether an insured, a law firm, "knew or . . . could have reasonably foreseen that its representation . . . might lead to a malpractice claim" and holding in the negative); Citak & Citak v. St. Paul Travelers Cos., Inc., No. 07 Civ. 5459, 2008 WL 1882660, at *3 (S.D.N.Y. Apr. 28, 2008) ("Courts determine whether an insured is on notice of a potential claim using an objective reasonableness standard.").

law, framing the analysis as a two-step mixed

subjective/objective test. See Selko v. Home Ins. Co., 139 F.3d

146, 151-52 (3d Cir. 1998) (citing Mt. Airy with approval and

articulating a mixed subjective/objective test, where "[f]irst,

it must be shown that the insured knew of certain facts.

Second, . . . it must be determined that a reasonable attorney

in possession of such facts would have had a basis to believe

that the insured had breached a professional duty. That the

insured denies recognizing such a basis on grounds of ignorance

of the law, oversight, psychological difficulties, or other

personal reasons is immaterial."); see also Coregis Ins. Co. v.

Baratta & Fenerty, Ltd., 264 F.3d 302, 306 (3d Cir. 2001)

(applying the mixed test articulated in Selko "insofar as it

instructs us first to consider the subjective knowledge of the

insured and then the objective understanding of a reasonable

[insured] with that knowledge"); Westport Ins. Corp. v. Hanft &

Knight, P.C., 523 F. Supp. 2d 444, 456 (M.D. Pa. 2007)

("Although no Pennsylvania court has directly addressed

application of the prior knowledge exclusion, the Third Circuit

has predicted that the Pennsylvania Supreme Court would apply a

mixed subjective/objective standard to determine whether claims

were excluded from coverage under [a prior knowledge]

provision."); accord HSB Group, Inc. v. SVB Underwriting, Ltd.,

No. 04 Civ. 2127, 2009 WL 3188431, at *30 (D. Conn. Sept. 30,

2009) (analyzing under Connecticut law a prior knowledge
exclusion using a two-part subjective/objective test).  Under
the mixed standard, a Court first asks the subjective question
of whether the insured had knowledge of the relevant facts and,
second, the objective question of whether a reasonable person in
the insured's position would foresee that those facts might be
the basis of a Claim.  See Coregis, 264 F.3d at 306; Selko, 139
F.3d at 152; Executive Risk Indem. Inc. v. Pepper Hamilton LLP,
865 N.Y.S.2d 25, 29, 56 A.D.3d 196 (App. Div. 2008) (applying
mixed two-step subjective/objective analysis under Pennsylvania
law), aff'd as modified 13 N.Y.3d 313 (2009).  While the Second
Circuit in Westport declined "to predict the path the New York
courts would take," 255 Fed. Appx. at 594, this Court finds the
Third Circuit's mixed subjective/objective analysis of prior
knowledge exclusions persuasive and consistent with Judge
Jones's analysis in Westport.  Therefore, this Court will
analyze the no prior knowledge exclusion at issue in the instant
dispute under the mixed subjective/objective standard.

### 2. Application of Law to the Facts

As a threshold matter, the prior knowledge exclusion set
forth in Section 1 of the Policies is unambiguous; therefore,
the Court applies its plain terms in holding, as a matter of
law, that ICC "had knowledge or reasonable basis upon which to

anticipate that the **Wrongful Act** or any **Interrelated Wrongful Act** could result in a **Claim**." (Policies § 1.2.) Specifically, the Securities Division's June 2004 inquiry, the allegations in the October 2004 Alston Letter, the Summary Order accompanying the Alston Letter, and the checklist prepared by ICC indicating its intention to notify its then-insurer of the Alston Letter, would have enabled a reasonable person in ICC's position to expect a Claim, particularly where the same ICC counsel—Ms. Tarentino—was involved both in the Securities Division inquiry and in the Alston Letter follow-up.

The exclusion at issue requires that ICC either had "knowledge or reasonable basis upon which to anticipate" a Claim. (Policies § 1.A.2 (emphasis added).) Taking the initial subjective prong of the mixed analysis, there is no dispute that ICC was aware of the June 2004 investigation, the October 2004 Alston Letter, and the Summary Order enclosed with the Alston Letter, and that all three items related to Jones.[6] (See Joint

---

[6] ICC states that because, after receiving the Alston Letter, it conducted an investigation that revealed no claim existed, "[i]t is untenable to suggest that a future claim can be anticipated." (ICC Opp'n 20.) ICC cites Safeguard Ins. Co. v. Angel Guardian Home, 946 F. Supp. 221 (E.D.N.Y. 1996), for the proposition that "the insured may proffer a reasonable excuse or explanation for a delay in notification, such as lack of knowledge or a good faith belief in non-liability." Id. at 226. "An insured asserting this defense has a duty to make some inquiry when circumstances raise the possibility of liability; when inquiry leads to the reasonable conclusion that no liability will result or that no claim would be made, the insured may be excused from giving notice." Id. at 227. Safeguard, however, did not involve a "knowledge or reasonable basis to anticipate" claim; it dealt with whether an insured gave timely notice after it was informed that a covered event had occurred but did not notify the insurer of the event until the summons and complaint were filed. Id. at 228. Thus, Safeguard does not help ICC here.

Statement ¶¶ 32, 33, 39.)  Specifically, Ms. Tarentino, an ICC
lawyer, fielded the Securities Division's inquiry in June 2004
and, in October 2004, prepared an initial checklist with respect
to the Alston Letter with boxes checked off to update Jones's
Form U-5 and report the Letter to ICC's insurer.  (Id. ¶ 42.)
Because the same ICC counsel was privy to the allegations from
both the Securities Division in June 2004 and the Alston Letter
in October 2004, ICC cannot claim that it had no subjective
knowledge of the relevant facts prior to the inception date of
the Policies.  ICC also argues that it had no knowledge that BAB
ever was sold through ICC because the Alston Letter referred to
the late 1999 and early 2000 period, while the Summary Order
concerned the time period after Jones's affiliation with ICC.
(ICC Mem. 14.)  This assertion is factually inaccurate as the
Summary Order includes the year 2001 and the parties do not
dispute that Jones was a registered representative of ICC
through December 31, 2001.  (Joint Statement ¶ 31.)  Even though
ICC determined that Ms. Alston did not invest in BAB, it cannot
reasonably claim that it "had no knowledge that BAB was ever
sold through ICC" where, despite not identifying ICC by name,
the Summary Order connects Jones to the BAB investment during
the time that Jones still was affiliated with ICC.  In further
support of its "no knowledge" argument, ICC claims that it was
unaware that the Securities Division issued a Summary Order

against Jones on September 13, 2004 because the Order did not mention ICC and was not served on ICC.  (ICC Mem. 8.)  Even if true, there is no dispute that ICC became aware of the Summary Order the following month when it was enclosed with the Alston Letter.  Therefore, under the first subjective prong of the mixed analysis, there is no dispute that, prior to the inception date of the Policies, ICC "knew of certain facts."  Selko, 139 F.3d at 152.

Under the second objective prong of the mixed analysis, a reasonable attorney in possession of these facts would have a basis to anticipate that ICC "might expect such facts to be the basis of a claim against [ICC]."  Executive Risk, 13 N.Y.3d 313 (citing Coregis, 264 F.3d at 306; Selko, 139 F.3d at 152)).  ICC's arguments to the contrary are unavailing.  ICC contends that because Ms. Alston's lawyer provided verbal assurance to ICC to disregard the allegations in his client's letter, there was no objective basis to anticipate a claim.  Like ICC, the insured defendant in Westport alleged that it did not "kn[o]w [n]or could have reasonably foreseen that [a Wrongful Act] might be expected to be the basis of a CLAIM or suit" because the potential claimant on two occasions "advised [the insured] that a malpractice claim would not be brought."  2006 U.S. Dist. LEXIS 31329, at *3, 4.  Judge Jones rejected this argument and held that, under an objective standard, the insured's subjective

belief that a claim would not be brought based on the potential claimant's assurances was irrelevant since a reasonable lawyer would have foreseen a claim. Id. at *15-16. Moreover, ICC's contention that the withdrawal of the Alston Letter led ICC reasonably to believe that the matter was dropped for good is undermined by the undisputed evidence in the case. On November 8, 2004,—the same day Ms. Alston's lawyer told ICC to disregard his client's letter—ICC filed Ms. Alston's complaint with the NASD and added it to Jones's Form U-5. (Joint Statement ¶ 43.) ICC answered "Yes" in response to Form U-5, question 8, which asked, "Is the customer complaint pending?" (Id. Ex. 27 at 5.) Had ICC reasonably thought that the Alston matter was dropped for good, as it alleges now, it would have answered "No" to question 8, and selected the box labeled "Withdrawn" in response to question 9, which asked, "If the customer complaint is not pending, provide status[]." (Id.) ICC also argues that it did not have a reason to anticipate a Claim based on Investigator Pruett's June 2004 investigation since such inquiries "are matters of routine in [ICC's] business that typically lead to nothing." (ICC Mem. 19.) Ms. Tarentino testified that ICC receives twenty or thirty Securities Division inquiries per year, or 1-3 per month, and that "state inquiries are . . . regular and routine in [ICC's] business." (Aff. of Terence P. Cummings, Ex. I, 86:11-87:8.) Moreover, ICC asserts that

46

"[t]here was nothing whatsoever about the North Carolina request for information about Jones' sale to Patti Whitehead that could possibly have led ICC to anticipate a claim."  (ICC Mem. 19.) Even if ICC did not anticipate that a Claim would result solely from the June 2004 investigation, when viewing the June 2004 inquiry together with the October 2004 Alston Letter and enclosed Summary Order, ICC had a reasonable basis to anticipate a Claim.   Therefore, taking together the June 2004 Securities Division's inquiry of Jones, which involved the account of Patricia Whitehead (who later was added as a claimant in the Underlying Arbitrations), the October 2004 Alston Letter's allegation of Jones's improper sale of BAB in late 1999 and early 2000, and the Summary Order's mention of Jones's sale of BAB investments in 2001, the Court holds that an insured in ICC's position reasonably could have anticipated a Claim.

### 3. Quanta Did Not Waive Enforcement of the Section 1 Exclusion

Construing ICC's next argument in a light most favorable to ICC—and not as wholly inconsistent with its position that it had neither knowledge nor a reasonable basis to anticipate a future Claim—ICC appears to contend that Quanta has waived enforcement of the Section 1 exclusion because ICC disclosed to Quanta in its insurance application, signed September 22, 2004, that ICC

anticipated claims for professional liability. (ICC Mem. 4; ICC Opp'n 9 n.5.)[7]

An insurer can waive certain defenses where there is proof that the insurer intended to abandon that defense or where such an intention can be inferred clearly from the circumstances. Steadfast Ins. Co. v. Stroock & Stroock & Lavan LLP, 277 F. Supp. 2d 245, 254 (S.D.N.Y. 2003) (citing Interstate Indem. Co. v. Cont'l Ins. Co., No. 94 Civ. 5201, 1998 WL 118165, at *2 (S.D.N.Y. Mar. 16, 1998)). But where an insurer reserves its right to deny coverage, estoppel and waiver may not be inferred. Id.

In support of its waiver claim, ICC contends that it responded "yes" to question 38 of its insurance application, which asked, "Does the Applicant or any of its Partners, Directors, Officers, Employees or Registered Representatives have any knowledge of any fact or circumstance which might give rise to a claim under the proposed policy?" (Joint Statement Ex. 5; ICC Mem. 4.) Question 38 states further, "[i]f 'Yes', attach full details" (Joint Statement Ex. 5); however, any such "details" were not provided to the Court in the exhibit containing the insurance application. Initially, ICC argued

---

[7] ICC contends that had Quanta sought rescission of the Policies based on ICC's alleged non-disclosure of the Alston Letter and the Securities Division inquiry in its insurance application, Quanta would not have had a basis to rescind under Spectrum, 930 F. Supp. 825. (ICC Opp'n 9.) Without passing judgment on ICC's contentions, ICC's point is irrelevant since Quanta's motion for summary judgment does not seek rescission.

that because Quanta could not locate its underwriting file for the Policies, ICC is entitled "to an inference that the North Carolina investigation and Alston were disclosed" to Quanta in the attachments to ICC's insurance application. (ICC Mem. 4.) The Court need not consider this request because after ICC raised this issue in its opening brief, Quanta produced the underwriting file, and ICC—without objection from Quanta—had Magistrate Judge Peck preclude its use in this matter. (Pl. Quanta's Mem. of Law in Opp'n to Def. ICC's Mot. for Summ. J. and in Further Supp. of Its Mot. for Summ. J. ("Quanta Opp'n") 3.)

In what appears to be a further effort to argue waiver, ICC notes that Quanta did not reference the Securities Division investigation or the Alston Letter in either of its reservation of rights letters, dated October 3, 2005 and February 10, 2006. (ICC Mem. 6-7; Joint Statement Ex. 10.) Even if true, this fact alone does not advance any purported waiver claim since Quanta's subsequent letters disclaiming coverage dated June 19, 2006, October 25, 2006, and February 12, 2007, clearly reference both the Alston Letter and the Securities Division investigation as grounds for denying coverage. (Joint Statement Exs. 30-32.) Moreover, each denial of coverage letter states that it "supplement[s] and, if inconsistent therewith, supercede[s]

prior correspondence from or on behalf of Quanta."  (Id.)
Therefore, Quanta timely reserved its right to decline coverage.

Based on the foregoing, the Court holds that ICC has failed
to raise a genuine issue of material fact to dispute that it
knew or had a reasonable basis to anticipate that a Claim could
result; therefore, the exclusion in Section 1.A applies to bar
defense coverage for ICC.

C. Pursuant to Section 3, Exclusion D.3 of the Policies, ICC
Had Notice that the Allegations in the Underlying
Arbitrations Were the Subject of the June 2004 Securities
Division Investigation, October 2004 Alston Letter, and
Summary Order

Quanta's third and final argument for summary judgment is
that, even if the Underlying Arbitrations are not deemed a
single Claim made prior to the inception of the Original Policy,
coverage still is not available pursuant to the Policies' bar of
defense and damages coverage

> for any **Claim** . . . arising out of, based
> upon or in consequence of, directly or
> indirectly resulting from or in any way
> involving . . . a. any **Claim**, demand, suit,
> proceeding or investigation of which any
> **Insured** had notice, pending on or prior to
> the inception date of the **Policy Period** . .
> .; or b. any fact, matter, circumstance,
> situation, transaction or event underlying
> or alleged in such demand, suit, proceeding,
> claim or investigation[] regardless of the
> legal theory upon which such **Claim** is
> predicated.

(Policies § 3.D ("Exclusion D.3"); Quanta Mem. 17.) Quanta states that even though the Alston Letter proved to be groundless, it "was clearly a claim or demand." (Quanta Mem. 17.) Further, Quanta claims that "it is beyond question that the Securities Division investigation of Jones for his sales of BAB Productions securities was an investigation." (Id.)

ICC argues that, first, Exclusion D.3 "is overly broad" and "ambiguous" because it "allows claims to be interrelated even where the smallest facts coincide." (ICC Mem. 22-23.) Second, ICC contends that a causal connection linking the Alston Letter to the Underlying Arbitrations is lacking because even if Jones's "unlawful sale of the unregistered BAB securities may have formed the hub of the wheel whose spokes led to each of the North Carolina investigation and the underlying arbitrations, and even, arguendo, Alston, each of those spokes is independent of the other." (ICC Opp'n 21.) Third, ICC contends that Exclusion D.3 does not apply because the Alston Letter is not a Claim within the meaning of the Policies, ICC was not on notice of any fact alleged by Ms. Alston because the Alston Letter proved to be erroneous, and ICC was not on notice of any fact alleged in the Summary Order because it referenced a time period after Jones's affiliation with ICC. (ICC Mem. 20.)

### 1. Legal Standard for Interpreting Exclusions

An insurer generally bears the burden of proving that a Claim falls within the scope of an exclusion by establishing that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case.  Seneca, 2004 WL 1145830, at *10 (citing Vill. of Sylvan Brach, 55 F.3d at 115).  Exclusions "are to be accorded a strict and narrow construction."  Seaboard, 64 N.Y.2d at 311.  Where an exclusion lists more than one type of relationship to the actions for which coverage is sought and is separated in the disjunctive—by use of the word "or"—the insurer need not show that every relationship is unambiguous and applicable so long as one relationship is unambiguous and applicable.  See Pereira v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 525 F. Supp. 2d 370, 376 (S.D.N.Y. 2007) ("[T]he particular structure of the prior litigation exclusion in the [insurance] policy does not require [the insurer] to demonstrate that every term in the clause is unambiguous.  The exclusion clause lists many possible relationships that [the litigations] may have to one another such that the . . . judgment would be barred from coverage, and it does so with the use of the critical conjunction 'or.'") (emphasis in original), aff'd by 330 Fed. Appx. 5, 6 (2d Cir. 2009) (rejecting appellant's claim that the district court's interpretation of the prior litigation exclusion renders that clause so broad as

to be meaningless or to defeat the parties' intentions);
Zunenshine, 1998 WL 483475, at *5 (noting that "both exclusions
are phrased in the disjunctive, that is, a claim is excluded if
it arises out of 'any fact, circumstance, situation,
transaction, event or Wrongful Act'") (emphasis in original).

### 2. Application of the Law to Exclusion D.3

The Court holds as a matter of law that Quanta has carried
its burden to show that Exclusion D.3 is unambiguous and applies
to the instant case to bar defense and damages coverage and that
ICC has failed to demonstrate that a genuine issue of material
fact exists for trial.  Quanta need only show that the
Underlying Arbitrations are related clearly to one of the
several possible relationships described in Exclusion D.3.  See
Pereira, 525 F. Supp. 2d at 376.  Exclusion D.3 clearly
contemplates exclusion for Claims, demands, or investigations
"in any way involving" the Underlying Arbitrations.  (Policies §
3.D.3.a & b.)  Quanta has shown that the Underlying Arbitrations
involve the allegations in the Alston Letter, Summary Order, and
Securities Division investigation because, like the Underlying
Arbitrations, these three matters generally involve Jones, and
the Alston Letter and accompanying Summary Order specifically
relate to Jones's sale of unregistered BAB securities during a
time when Jones was affiliated with ICC.

ICC brings several arguments in support of its position that Exclusion D.3 does not bar coverage. First, ICC argues that "[t]he breadth of the exclusion renders the coverage of the policy illusory" and is contrary to the narrow construction that Courts must give exclusion provisions because "any event that took place before the policy incepted could potentially leave ICC uninsured." (ICC Mem. 23.) However, the district court in Zahler upheld a prior notice exclusion, containing language similar to Exclusion D.3 to preclude coverage. See Zahler, 2006 U.S. Dist. LEXIS 14263, at *14, 20 (precluding coverage for claims "based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact" that was the subject of notice given under any other insurance policy); cf. Policies § 3.D (precluding coverage "for any **Claim** . . . arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving . . . any **Claim**, demand, suit, proceeding or investigation of which any **Insured** had notice"). Moreover, the Second Circuit recently affirmed a district court's interpretation of a similarly-worded exclusion as not being "so broad as to be meaningless or to defeat the parties' intentions." Pereira, 330 Fed. Appx. at 6, aff'g 525 F. Supp. 2d 370, 375 (denying coverage pursuant to a prior litigation exclusion, which precludes coverage "for loss in connection with any claim made

54

against any of the Insureds based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving[] . . . any fact, circumstance or situation underlying or alleged in any prior and/or pending litigation").

Second, ICC contends that there is no causal connection linking the Securities Division investigation and Alston Letter to the Underlying Arbitrations.  (ICC Opp'n 21.)  Specifically, ICC maintains that "the claimants in the Underlying [Arbitrations] brought suit against ICC because they were defrauded by Jones into parting with their savings, not because the North Carolina Securities Division investigated Jones." (ICC Mem. 20.)  ICC fails to acknowledge, however, that the applicability of Exclusion D.3 is not contingent upon there being a "causal connection."  While the Exclusion applies if the Underlying Arbitrations "aris[e] out of," are "in consequence of," or "result[] from" the Securities Division investigation, Summary Order, or Alston Letter—all terms that indicate some causal connection—Exclusion D.3 also applies if the Underlying Arbitrations "in any way involv[e]" the allegations in the Securities Division investigation, Summary Order, or Alston Letter.  (Policies § 3.D.)  ICC itself acknowledges that Jones's "unlawful sale of the unregistered BAB securities may have formed the hub of the wheel whose spokes led to each of the North Carolina investigation and the underlying arbitrations,

and even, arguendo, Alston," thereby conceding that there is no issue of fact that Jones's sale of BAB was "involved" in each of the inquiries at issue.  (ICC Opp'n 21.)

ICC's third argument against Exclusion D.3's application is the familiar contention that the Alston Letter is not a Claim within the meaning of the Policies, ICC was not on notice of any fact alleged by Ms. Alston because the Alston Letter proved to be erroneous, and ICC was not on notice of any fact alleged in the Summary Order because it referenced a time period after Jones's affiliation with ICC.  (ICC Mem. 20.)  The Court already has held that:  (1) the Alston Letter is a Claim, as defined in the Policies; (2) ICC had knowledge of the content of the Securities Division Investigation, Summary Order, and Alston Letter; and (3) the Summary Order referenced a time period during Jones's affiliation with ICC—namely, the year 2001— thereby refuting ICC's contention that it was not on notice of the facts alleged in the Summary Order.  Therefore, ICC's third argument against Exclusion D.3 is without merit.

For the foregoing reasons, the Court holds as a matter of law that the clear terms of Exclusion D.3 apply to bar defense and damages coverage to ICC.

## D. Summary Judgment for Quanta is Warranted Notwithstanding ICC's Counterclaims

ICC states that it is entitled to summary judgment on its three counterclaims seeking coverage and damages or, alternatively, its three counterclaims seeking rescission. (Id. 23-24.)  Quanta's motion to dismiss ICC's counterclaims for rescission was pending with the Court during briefing of the instant motions for summary judgment; however, the Court since has decided the motion in Quanta's favor.  In its Opinion and Order dated April 30, 2008, the Court granted Quanta's motion to dismiss ICC's first two counterclaims that sought rescission on grounds that the Policies are unlawful group insurance policies and violate New York's excess line requirements, and held that ICC does not have a private right of action to enforce these provisions of the New York insurance law.  See Quanta, 2008 WL 1910503, at *5-6.  The Court also dismissed ICC's third counterclaim alleging that Quanta was an unauthorized insurer doing business in New York in violation of Section 1102 of the New York Insurance Law on the ground that a judicially created penalty was not one of the penalties envisioned by the Legislature in drafting Section 1102.  See id. at *6.  The Court did not dismiss ICC's fourth, fifth, and sixth counterclaims seeking declaratory judgment, specific performance, and damages for breach of contract.  See id.  For the reasons already stated

in this Opinion and Order, the Court denies ICC summary judgment on its remaining three counterclaims.

ICC contends that in the event that the Court finds that coverage for the Underlying Arbitrations is precluded by the terms of the Policies, then both Policies issued by Quanta to ICC are malum prohibitum, and thus voidable by ICC at its option because Quanta acted unlawfully in conducting business in New York without complying with New York's regulatory requirements. (ICC Opp'n 22.)  The Court rejects this argument because it is premised on Quanta's purported violation of New York insurance laws—a claim that the Court has rejected in this Opinion and in its April 30, 2008 Opinion.  Quanta, 2008 WL 1910503, at *4-5.

## CONCLUSION

For the foregoing reasons, Quanta's motion for summary judgment is GRANTED and ICC's motion for summary judgment is DENIED.  The Court declares that based on Sections 6.A, 1.A, and 3.D.3 of the Policies, Quanta is not obligated to afford coverage to ICC, in whole or in part, including defense and damages, for the Underlying Arbitrations.  The Clerk of the Court is directed to close this case.


**SO ORDERED.**
**New York, New York**

December /7, 2009

U.S.D.J.




Copies of this Opinion and Order have been e-mailed to:

Alexis J. Rogoski, Esq.
Traub Lieberman Straus & Shrewsberry LLP
Mid-Westchester Executive Park
Seven Skyline Drive
Hawthorne, New York 10532

Terry Cummings, Esq.
Hitchcock & Cummings, L.L.P.
757 Third Avenue, 25th Floor
New York, New York 10017